Frank BRADFORD, on behalf of himself and all others similarly situated,

v.

Ruben EDELSTEIN, Individually and in his capacity as Mayor of the City of Brownsville and ex officio member of the Public Utilities Board of the City of Brownsville, Israel Lizka, Mario Yzaguirre, Marcelo Hernandez, Kermit Cromack, and Virgil Fredieu, Individually and in their capacities as board members of the Public Utilities Board of the City of Brownsville, and Valois Pagan, general manager of the Public Utilities Board of the City of Brownsville.

Civ. A. No. B–77–272.

United States District Court,
S. D. Texas,
Brownsville Division.

Feb. 5, 1979.

Texas Rural Legal Aid, Inc., Gerald A. Garcia, Brownsville, Tex., for plaintiff.

Gerald R. Zwerneman and O. B. Garcia, Brownsville, Tex., for defendants.

## MEMORANDUM AND ORDER

GARZA, Chief Judge.

This is a civil action seeking compensatory, declaratory and injunctive relief. The lawsuit was brought under the provisions of 42 U.S.C. § 1983,[1] and this Court's jurisdiction is based on 28 U.S.C. § 1343(3).[2] The Complaint was filed on November 14, 1977, alleging that the Defendants had acted under color of law to deprive the Plaintiff (and the class he seeks to represent) of due process of law by terminating utility services used by the Plaintiff without advance notice and without an opportunity to contest the termination. Also submitted on November 14, 1977, was an application for a temporary restraining order and a brief in support thereof, along with motions requesting a preliminary injunction and class certification.

On that same day, this Court convened a hearing on the application for a temporary restraining order. After some preliminary arguments, counsel for the Defendants were given an hour to prepare for further discussion as to whether the Public Utilities Board (hereinafter referred to as PUB) had any type of system for giving proper notice to a customer prior to cutting off his utilities. Upon resumption of the hearing, evidence and additional arguments were

---

1. 42 U.S.C. § 1983 in essence provides that every person who, under color of any state statute, ordinance, regulation, custom or usage, subjects or causes to be subjected any person to the deprivation of any rights, privileges or immunities secured by the Constitution and laws shall be liable to the party injured thereby.

2. 28 U.S.C. § 1343(3) gives to district courts original jurisdiction over any legally authorized civil action seeking to redress the deprivation under color of law of any right secured by the Constitution of the United States or by any act of Congress providing for equal rights.

presented to the Court. As a result of the hearing, the Defendants agreed to a temporary restraining order, and this Court ordered the Defendants to reconnect the Plaintiff's utilities upon Plaintiff's payment of his last bill.

On November 15, 1977, the Court signed an agreed-to Temporary Restraining Order submitted by the parties. In that Order, it was noted that the Defendants had terminated the Plaintiff's water and electricity service and had refused to reconnect the services unless the Plaintiff paid charges amounting to $102.00, even though the Plaintiff owed only $32.00 for service from October 2 to November 8, 1977. It was further noted in the Order that the services had been terminated without notice and without opportunity to be heard, and that the Plaintiff had been without those services since November 8, 1977. Finding that the Plaintiff would suffer immediate and irreparable injury before a hearing could be held on his Motion for a Preliminary Injunction, and finding that the termination of such essential services without notice and opportunity to be heard might be violative of the Plaintiff's constitutional rights, the Court ordered the Defendants to immediately reinstate Plaintiff's utilities upon his payment of the amount owed to the PUB for actual services used by the Plaintiff, and temporarily restrained the Defendants from terminating utility services to their customers without adequate notice and opportunity to be heard. Finally, it was agreed that the Temporary Restraining Order would be continued until the parties notified the Court otherwise.

On September 8, 1978, the parties filed the following Stipulations of Fact:

1) Plaintiff, Mr. Frank Bradford, is a 77 year old resident of Brownsville, Cameron County, Texas. His address is 125 W. Fronton Street (rear), Brownsville, Texas.

2) Frank Bradford's account number with the PUB until November 8, 1977, was 260–15500–1; his current account number is 2600–15500–2;

3) On or about November 2, 1977, Mr. Bradford paid his utilities bill with a personal check drawn on a bank account which had been closed since April 16, 1975; the check therefore bounced. This was the only time Mr. Bradford had paid his bill with a bad check, and he had previously paid all his utility bills on time.

4) From August 30, 1977, up to and including November 8, 1977, there was in effect a PUB written policy to terminate without notice the utility services of all customers who paid their bills with a bad check. [This policy was attached to the stipulations and labeled Exhibit 1; a copy of this exhibit has been attached to this Memorandum and Order as Appendix A.]

5) As a result of the above policy, Mr. Bradford's utility services (water and electricity) were terminated, without prior notice, on November 8, 1977.

6) The electricity and water utilities were disconnected from Mr. Bradford's residence on November 8, 1977, pursuant to the authority of the PUB manager's memorandum of August 30, 1977, attached to the stipulations as Exhibit 1 [Appendix A].

7) As far as the PUB personnel knew, there was no danger of any kind which existed on or about November 8, 1977, which would have necessitated termination of utility services to Mr. Bradford without giving notice to him.

8) Utility services to Mr. Bradford were not reconnected until November 14, 1977, when this Court ordered Defendants to reconnect the services even though Mr. Bradford's check had not been cleared.

9) Until the PUB policy was changed on November 21, 1977, all customers who paid their utilities bill with a bad check had their utility services disconnected without prior notice pursuant to the memorandum of August 30, 1977, attached to the stipulations as Exhibit 1 [Appendix A].

10) Pursuant to PUB policies effective November 21, 1977, all persons who pay their utilities bill with a bad check now receive 24 hours' notice that their utility service will be disconnected for failure to comply with the notice that their check was

returned by the bank. Said notice is given by placing a red tag on the customer's door by a PUB serviceman. A copy of the red tag notice was attached to the stipulations as Exhibit 2. [A copy of this exhibit is attached to this Memorandum and Order as Appendix B].

11) At the time this suit was filed, and at the present time, PUB customers receive their monthly bills by mail. A true and correct copy of the bill format sent to PUB customers was attached to the stipulations as Exhibit 3. [A copy of this exhibit is attached to this Memorandum and Order as Appendix C.]

12) A customer's utility bill is due and must be paid by the customer approximately 14 to 16 days after the bill is mailed by PUB.

13) If a customer's bill has not been paid by the due date, a reminder notice is mailed to the customer within two days. A true and correct copy of the reminder notice mailed to customers now and at the time this suit was filed was attached to the stipulations as Exhibit 4. [A copy of this exhibit is attached to this Memorandum and Order as Appendix D.]

14) If a customer has not paid his bill within five days after the due date, the PUB will issue collection-disconnect orders to its servicemen. A true and correct copy of the collection-disconnect order was attached to the stipulations as Exhibit 5. [A copy of this exhibit is attached to this Memorandum and Order as Appendix E.]

15) The PUB servicemen will disconnect utility services pursuant to a collection-disconnect order unless the customer pays the amount outstanding in his account at the time the serviceman arrives to disconnect the utilities at the customer's house.

16) The PUB is an agency of the City of Brownsville and is operated under the following authority: Texas Revised Civil Statutes arts. 1165, *et seq.* and art. 1446c; the Home Rule Charter of the City of Brownsville; and the Code of Ordinances, §§ 34 *et seq.*

17) For the six-month period beginning September, 1977, and continuing through February, 1978, the PUB received approximately 519 bad checks as payment for customers' utility bills.

18) For the three-month period beginning September, 1977, and continuing through November, 1977, the PUB received approximately 306 bad checks from its customers in payment for utility bills.

19) In the six-month period from June, 1977, through November, 1977, the PUB registered approximately 13,724 collection-disconnect notices to be acted upon. This figure represents an approximate average of 2,287 disconnect actions per month for nonpayment of customers' utility bills.

20) The notice of proposed utility disconnection presently issued by the PUB to its customers was attached to the stipulations as Exhibits 2, 3, and 4 [Appendices B, C, D and E].

21) The procedures and policies used on or about November 8, 1977, to bill customers and/or disconnect utility services are attached to the stipulations as Exhibits 6 and 7. [Copies of these exhibits are attached to this Memorandum and Order as Appendices F and G.]

22) The rules and regulations presently governing PUB's electric service collection and disconnect policy were attached to the stipulations as Exhibit 8. [A copy of this exhibit is attached to this Memorandum and Order as Appendix H.]

23) Mr. Bradford closed his checking account at National Bank of Commerce, in Brownsville, on April 16, 1975.

24) Mr. Bradford did not open another checking account in any bank in Brownsville, Texas, until February 2, 1976, at which time he opened a checking account at First National Bank.

25) Mr. Bradford had no checking account in Brownsville between April 16, 1975, when he closed his account in National Bank of Commerce, and February 2, 1976, when he opened a checking account at First National Bank at Brownsville. Between these two dates, he kept his money at home or in a bank in Lufkin, Texas.

26) Mr. Bradford drew only one check on the National Bank of Commerce account which he had closed on April 16, 1975, between such closing date and November, 1977, and such check was the one he gave PUB in payment of his utility bill.

27) Mr. Bradford drew approximately 42 checks on his checking account at First National Bank at Brownsville, between the time he opened that account on February 2, 1976, and November 8, 1977.

On September 11, 1978, the Plaintiff filed a Motion for Partial Summary Judgment; on September 19, 1978, the Defendants filed a Motion for Summary Judgment and an Opposition to the Plaintiff's Motion for a Partial Summary Judgment. After giving careful consideration to the motions, the briefs of counsel, the stipulations, the affidavits, the answers to interrogatories, and the applicable law, it is the opinion of this Court that the Plaintiff's Motion for Partial Summary Judgment should be granted, while Defendants' Motion for Summary Judgment should be denied.

█ In ruling on a summary judgment motion, the Court's primary function is to determine whether or not a genuine issue exists over a material fact. *See Cox v. Bell Helicopter International*, 425 F.Supp. 99, 101 (N.D.Texas 1977). Rule 56 of the Federal Rules of Civil Procedure provides that if there is no genuine issue as to any material fact, then the Court must render a summary judgment if the movant is entitled to such as a matter of law. In making this determination, the Court must be mindful that: *one*, the movant has the burden of showing the absence of a genuine issue as to any material fact; and *two*, the evidence must be viewed in the light most favorable to the opposing party. *See Adickes v. Kress & Company*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). These basic propositions have guided this Court in reviewing the documents on file in this case, and have been followed in reaching the conclusion that there is no genuine issue as to any material fact and that the Plaintiff is entitled to a partial summary judgment as a matter of law.

## I. DEPRIVATION OF A CONSTITUTIONAL RIGHT UNDER COLOR OF LAW

█ In every suit brought under the provisions of 42 U.S.C. § 1983, there are two basic elements a plaintiff must show in order to succeed in his lawsuit. He must prove: *one*, that the defendant deprived him of a right secured by the Constitution and laws of the United States; and *two*, that this deprivation occurred while the defendant was acting under color of law. *See Adickes, supra*, at 150, 90 S.Ct. 1598. Thus, this Court is initially faced with having to determine whether the Defendants in this case have deprived Mr. Bradford of a right secured by the Constitution of the United States and, if they have done so, whether they did so while acting under color of law.

## A. THE EXISTENCE OF A CONSTITUTIONAL RIGHT

█ The Fourteenth Amendment to the Constitution of the United States prohibits the states from depriving any person of life, liberty or property without due process of law. With regard to property rights, the interests protected by the Constitution are, for the most part, not contained within the document itself. Instead, they are created and defined by independent sources, including state statutes or rules which grant or secure certain benefits for the citizenry. *Goss v. Lopez*, 419 U.S. 565, 572–573, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). A person's interest in a benefit or entitlement is a property interest protected by the requirements of due process if there are rules or explicit understandings that support the person's claim to the benefit or entitlement. *See Perry v. Sindermann*, 408 U.S. 593, 601, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). In light of these propositions, this Court must first determine whether or not Texas has created a substantive interest in continued utility services; if it has, then the next area of inquiry is whether or not that interest rises to the level of entitlement. *See Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 9, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978).

The record in the instant case amply supports the conclusion that customer expectation of continued availability of service from the public utility managed and controlled by the Defendants does indeed exist, and that such expectation is secured by existing rules or understandings. *See Limuel v. Southern Union Gas Company,* 378 F.Supp. 964, 966–967 (W.D.Texas 1974). Tex.Rev.Civ.Stat.Ann. art. 1446a, § 1 declares that it is the policy of the State of Texas "that continuous service by public utilities furnishing electric energy, natural or artificial gas, or water is absolutely essential to the life, health and safety of all the people, and that the willful interruption or stoppage of such services by any person or group of persons is a public calamity which cannot be endured." It has also been declared that the exercise of a municipality's right under Texas law to own and operate an electric light system is for the benefit of the public. *See West Texas Utilities Co. v. City of Spur,* 38 F.2d 466, 469 (5th Cir. 1930). Indeed, *dicta* in one Texas case indicated that municipal governments have a duty to furnish their citizens with those public conveniences necessary for the protection and benefit of the citizens, including water and electricity. *Texas-New Mexico Utilities Co. v. City of Teague,* 174 S.W.2d 57, 61 (Tex.Civ.App.—Fort Worth 1943, writ ref'd w. o. m.). Moreover, as set out in Article II, Sections 12 and 13 of the Brownsville Code, the City of Brownsville has asserted the power to acquire, build, own, maintain and operate, on an exclusive basis, public utility services used by it or the public, and to sell those services to the public as may be determined by the governing authority. In addition, the governing body of the PUB does not claim the right to terminate the services PUB provides at will; rather, it specifies the reasons for which those services can be disconnected.[3] In essence, those specified reasons amount to termination for cause.

When one considers the overall policies of the State of Texas, the City of Bronwsville and the PUB, it is clear that those policies have fostered legitimate reliance upon and expectation of continued water and electric service, absent termination thereof for reasonable and just cause. As noted in *Limuel, supra,* at 966, the majority of courts have had little difficulty in finding that continued utility service is a property right within the meaning of the due process clause of the Fourteenth Amendment; this Court feels no hesitancy or reluctance in joining that majority. Since this is so, the fact that Mr. Bradford's water and electric services were disconnected by employees of the PUB without any prior notice and without any opportunity to be heard supports the conclusion that Mr. Bradford was deprived of a constitutional right.[4]

**B. ACTING UNDER COLOR OF LAW**

In the instant case, despite their arguments to the contrary, there can be little doubt that the Defendants acted under color of state law in promulgating, approving or putting into effect the policies which resulted in termination of Mr. Bradford's utility services without notice or opportunity to be heard. The Defendants are in

---

3. For example, as noted in Appendix H, electric service provided by the PUB may be disconnected if: a bill has not been timely paid and a deferred payment agreement has not been timely entered into; failure to comply with the terms of a deferred payment agreement; violation of the PUB's terms and conditions; failure to comply with deposit or guarantee arrangements; tampering with meters or other PUB equipment; or where a known dangerous condition exists.

4. Other cases contain rationales which supply analogous support for this conclusion. For example, in *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), the issue before the Supreme Court was whether due process concepts required that certain welfare recipients be afforded an evidentiary hearing before their benefits could be terminated. *Id.,* at 260, 90 S.Ct. 1011. In affirming the lower court's holding that only a pre-termination hearing would satisfy constitutional due process requirements, the Supreme Court noted that for qualified recipients, welfare provides the means for obtaining fundamental necessities of life, *id.,* at 264, 90 S.Ct. 1011, and that governmental interests in conserving fiscal and administrative resources did not outweigh the interest served by requiring hearings prior to termination of benefits. *Id.,* at 266, 90 S.Ct. 1011.

effect municipal officials responsible for the operation of a city-owned utility. *See Lamb v. Hamblin*, 57 F.R.D. 58, 61 (D.Minn. 1972). As stipulated to by the Defendants, the PUB is an agency of the City of Brownsville, operated under the authority of state law, Brownville's Home Rule Charter and Brownsville's Code of Ordinances. Under these various authorities, the City has exclusive power to operate and maintain public utilities within the city limits. To give form to this power, the PUB was created as a city agency in charge of exercising full and complete authority with regard to the control, management and operation of the utilities system owned by the city, with the exception of setting the rates charged for the services. The rules and regulations governing the furnishing of electricity, water and sewage services to PUB's customers are promulgated or approved by the board members of the PUB. Those board members are appointed by the City Commissioners of Brownsville, with the Mayor of Brownsville included on the board as an *ex officio* member. The income from the utilities system goes to the operation, maintenance and repair of the system and to the payment of revenue bonds for repairing or extending the services, with all remaining income being turned over to the city for use in any legally authorized manner.

Considered as a whole, all of the above factors clearly indicate that when the Defendants herein act in their capacity as members of the board of the PUB or as managers of the system, they act under color of law. Therefore, since the termination of Mr. Bradford's utility services occurred in accordance with the written policies of the PUB, and since that termination was accomplished in a manner completely devoid of even minimally acceptable due process safeguards, this Court must conclude that Mr. Bradford was deprived of a right secured by the Constitution of the United States, and that this deprivation occurred under color of law.

## II. DUE PROCESS AND THE PROCEDURES OF THE PUB

The pronouncements of the Supreme Court in the recent case of *Memphis Light, Gas & Water Div. v. Craft, supra,* provided clear-cut guidance to this Court, virtually compelling the conclusion that the termination of Mr. Bradford's utilities, in accordance with past PUB policy, without notice and without any opportunity to contest the termination, violated his right to due process, and the further conclusion that the PUB's present policy concerning terminations also fails to comport with the requirements of due process.

One of the basic issues in *Craft* was whether, in order to comply with the requirements of due process, municipal utilities must notify their customers of the availability of procedures designed to resolve contested utility charges. *Craft, supra,* 436 U.S. at 13, 98 S.Ct. 1554. The notice procedure involved in *Craft* simply stated that payment was overdue and that service would be discontinued if payment was not rendered by a certain date. The Supreme Court decided that while this notification procedure was adequate to apprise recipients of the notice that there was a threat of termination of service, it was not reasonably calculated to inform them of the availability of an opportunity to present objections to the bills. *Id.,* at 14, 98 S.Ct. 1554. The Supreme Court went on to expressly declare that:

> Notice in a case of this kind does *not* comport with constitutional requirements when it does not advise the customer of the availability of a procedure for protesting a proposed termination of utility service as unjustified.

*Id.,* at 14–15, 98 S.Ct. at 1563 (emphasis added). While the factual circumstances of *Craft* differ from the factual circumstances of the instant case in both kind and degree, none of the differences are significant enough to *prevent application of the principles* established in *Craft* to the situation involved in the present lawsuit.[5] Under

---

**5.** Although the factual situation in the instant case differs in many ways from that present in *Craft,* there are also significant points of similarity between the procedures utilized by the PUB and the Memphis Light, Gas & Water Division involved in *Craft.* For example, both

those principles, the past disconnection procedures of the PUB, the present notice provided by the PUB prior to termination of a customer's utility service, and the procedures available to dispute any proposed disconnection of service were and are inadequate to satisfy the requirements of due process.

## A. THE PUB'S PAST TERMINATION PROCEDURES

The record in the instant case shows that no dispute exists over the essential facts involved in the termination of Mr. Bradford's utility services. Mr. Bradford's electricity and water were shut off without *any* notice and without *any* opportunity to dispute disconnection of those services. This termination of service without notice and without opportunity to contest the disconnection occurred in accordance with an express, written policy of the PUB. Clearly, then, no matter what standard one would apply, Mr. Bradford was denied due process under color of law.

The Defendants assert that Mr. Bradford was not entitled to notice and a hearing before his utilities were disconnected because no dispute existed over the amount or propriety of the bill involved, and because termination of service occurred due to his failure to properly pay that undisputed bill. Acceptance of this argument would require this Court to give *Craft* an unreasonably narrow reading. In this Court's view, *Craft* establishes that utility services such as those involved herein are essential, and that the termination thereof, for whatever reason, should not be undertaken without adequate notice of and opportunity to contest the termination. While the facts in this case show that it was indeed Mr. Bradford's "fault" for writing a check on a previously closed checking account, the Defendants had no way of knowing this at the time of disconnection. A bad check is not always the fault of the drawer of the check; bank errors resulting in improper failure to clear a check are not unknown, even in this golden age of computers. Furthermore, it does not unduly stretch the meaning of the word to conclude that one can "contest" a termination of utility service not only by challenging the amount or propriety of a particular bill, but also by seeking to explain and correct an error in the payment of a completely proper and undisputed bill. Requiring notice and opportunity to be heard prior to any disconnection of such vital services does not prevent the provider of the services from applying remedial measures to recoup losses and prevent reoccurrences of the error, or, if deemed necessary after hearing the explanations offered, disconnecting the services as planned. If a customer is given adequate notice and opportunity to respond to the threat of termination, many situations could be cleared up to the satisfaction of all involved without the sudden and complete termination of such essential services. Moreover, the Defendants apparently perceived no difficulty in giving five days of grace to those who did not pay their bills on time; surely, it would not have caused the Defendants any undue difficulty or harm to give customers who had paid a bill with a bad check an equivalent opportunity to rectify their mistake before cutting off their utilities. In the instant case, the termination of services occurred before the Defendants could have even discovered the existence of any dispute or reason to contest the disconnection.

When such vital services as water and electricity are involved, the focus must be on the procedures for termination, not on the type of reason a customer may have for trying to prevent termination. The requirements of due process simply assure fundamental fairness to everyone involved; in no way do they prevent or interfere with proper and legitimate methods of collecting bills and disconnecting services for just cause. In the instant case, therefore, the important issue is not the reason for the termination of services, but the method by which it was accomplished. That method, established by and carried out in accordance

---

utilities have similar billing, notice, termination and extended payment procedures. Compare Appendix H in the instant Memorandum and

Order with *Craft, supra,* at 5–6, n. 4, 98 S.Ct. 1554.

with the express, written policy of the PUB, was completely lacking in elemental due process safeguards; not only was there lack of any meaningful opportunity to be timely heard, there was absolutely no notice given whatsoever. No plaintiff could present a clearer denial of due process rights than Mr. Bradford has presented to this Court.

## B. THE PUB'S PRESENT TERMINATION PROCEDURES

Under current PUB policy, effective since November 21, 1977, all customers who pay a utilities bill with a bad check receive 24 hours notice that their utility services will be disconnected if they fail to clear the check within that time period. This notice is delivered by mail, telephone, or by the placement of a tag on the customer's door. (A copy of the notice given by the latter method is attached to this Memorandum and Order as Appendix B.) Also under current PUB policy, those customers who do not pay their bills by the due date noted on the bill receive through the mail a reminder notice telling them that payment is expected within five days or their services will be disconnected without further notice. This reminder notice includes two telephone numbers which customers are told to call if they wish additional information, but no notice is given of the availability of any procedure for complaining about a possibly erroneous bill. Under the principles announced by the Supreme Court in *Craft, supra,* it is painfully clear that the current policies of the PUB in terms of notice of and opportunity to contest terminations still do not comply with the requirements of due process.

As noted in *Mullane v. Central Hanover Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950):

An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. [Citations omitted.] The notice must be of such nature as reasonably to convey the required information, [citation omitted] and it must afford a reasonable time for those interested to make their appearance, [citation omitted].

Given this statement of basic due process principles, there is no doubt that the present PUB policy *vis-a-vis* termination of utility service for payment with a bad check is woefully inadequate in terms of those principles. It is difficult to perceive how anyone could reasonably assert that 24 hours notice is notice reasonably calculated to both apprise a customer of a pending disconnection and afford him reasonable opportunity to present objections thereto or to properly clear the check. This is especially so given the fact that two of the three methods of delivery of the notice—mail (apparently uncertified) or mere attachment to a door knob—make determination of who received the notice when virtually impossible. Furthermore, in many instances, such short notice would arrive at a time when it would be impossible to correct an error within the given period; it takes time to collect records, most banks have limited operating hours on certain days, and many people are subject to working hours or other employment-related requirements which would make rearrangement of schedules on short notice extremely difficult.

In addition to failing to provide a reasonable time for adequate response, it is also apparent that the present notice given by the PUB in termination situations is lacking in another aspect, and that this inadequacy is present in both bad check and failure-to-pay disconnection situations. The inadequacy involved is the failure to include in the notice reference to the availability of an administrative procedure designed to consider and resolve any complaints about erroneous billing or any challenge to termination of services. A public utility such as that operated by the Defendants herein must have such a procedure and must include reference to it on all termination notices.

The issue of whether due process requires a municipal utility to notify customers of

the availability of a procedure designed to redress complaints should a customer wish to contest a particular charge was raised and decided in *Craft*. The Supreme Court concluded therein that while a notice may. adequately apprise a customer of the threat of termination of services, such notice is constitutionally infirm if it fails to "advise the customer of the availability of a procedure for protesting a proposed termination of utility services as unjustified." *Craft, supra*, 436 U.S. at 14–15, 98 S.Ct. at 1563. Although *Craft* dealt with a billing controversy and not a bad check situation, the language used by the Supreme Court is broad enough to cover all termination situations, no matter what the reason might be for the proposed disconnection.

■ In *Craft*, the Supreme Court reviewed the analytical framework developed in the case of *Mathews v. Eldridge*, 424 U.S. 319, 334–335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), applied it to the case before it, and noted the following:

> Under the balancing approach outlined in *Mathews*, some administrative procedure for entertaining customer complaints *prior to termination* is *required* to afford reasonable assurance against erroneous or arbitrary withholding of essential services. The customer's interest is self-evident. Utility service is a necessity of modern life; indeed, the discontinuance of water or heating for even short periods of time may threaten health and safety. And the risk of erroneous deprivation, given the necessary reliance on computers, is not insubstantial.

*Craft, supra*, 436 U.S. at 18, 98 S.Ct. at 1564, 1565 (footnotes omitted; emphasis added). This Court can perceive no persuasive justification for limiting the teachings of *Craft* to only those cases in which the proper amount of a bill is in dispute and the termination threat is based upon failure to pay the disputed bill. As this Court sees it, the thrust of *Craft* is to afford reasonable means for avoiding mistaken terminations; it makes no distinctive difference whether disconnection is threatened because of failure to pay a bill or the payment of a bill with a bad check. In either situation, due process requires the giving of ade-

quate notice and opportunity to respond. For notice to be adequate in such situations, it must inform the recipient of a procedure for resolving disputes and must provide a reasonable length of time to employ that procedure. The notice presently given by the PUB in termination situations falls short of this required standard of adequacy.

■ Due process has been characterized as a flexible concept, calling for procedural safeguards that vary in number, scope and degree as particular circumstances warrant. *See Mathews v. Eldridge, supra*, 424 U.S. at 334, 96 S.Ct. 893. As the Supreme Court noted in *Mathews*:

> More precisely, our prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews, supra*, at 334–335, 96 S.Ct. at 903 (citation omitted).

■ In circumstances such as those involved in the instant case, the Supreme Court has, in *Craft*, balanced the various interests described in *Mathews* and determined that, as a bare minimum, due process requires prior notice of utility service terminations, and that the notice must include reference to the availability of *some* type of procedure for hearing and resolving complaints prior to termination. The Supreme Court's final conclusion in *Craft*, which conclusion must, in part, control this Court's resolution of the instant case, was stated as follows:

> Because of the failure to provide notice reasonably calculated to apprise respondents of the availability of an administrative procedure to consider their complaint of erroneous billing, and the failure to

afford them an opportunity to present their complaint to a designated employee empowered to review disputed bills and rectify error, petitioners deprived respondents of an interest in property without due process of law.

Craft, supra, 436 U.S. at 22, 98 S.Ct. at 1567. Therefore, in the present lawsuit, since the PUB fails to give adequate time in bad check situations between notice of proposed disconnection and actual disconnection of services, and since the notice given in all termination situations fails to apprise customers of the availability of a procedure to challenge termination and rectify errors in either billing or payment of bills, this Court must hold and declare that the current termination policies of the PUB do not comport with the requirements of due process.

█ One final contention of the Defendants in this area merits brief discussion. The Defendants argue that requiring notice and opportunity to be heard in cases such as Mr. Bradford's would place a tremendous burden on the PUB, due to the large numbers of bad checks received each month. However, as noted above, the Supreme Court in Craft has already evaluated and balanced the competing interests and decided that, where such vital services are involved, constitutional considerations of elemental fairness outweigh whatever the administrative costs and burdens might be in implementing minimally adequate notice and hearing procedures prior to disconnection of the services. Moreover, this Court remains unconvinced that the burdens such procedures may entail will be as tremendous and oppressive as the Defendants assert. For one thing, the PUB already gives what amounts to at least five days' notice when payments are not received on time. There would be no appreciable increase in costs or burdens to provide similar notice when a bad check is received in payment of a bill. Furthermore, the hearing procedures the PUB has to develop to comply with the requirements of due process need not be complex, elaborate or unduly expensive. Under the appropriate circumstances, providing an opportunity for informal discussion with a specifically, expressly designated employee authorized to correct a mistaken determination as to either the amount of a bill or the payment thereof could be a satisfactory due process hearing. See Craft, supra, at 16 n. 17, 98 S.Ct. 1554, citing as an example Goss v. Lopez, supra, 419 U.S. at 581–584, 95 S.Ct. 729. Finally, if it chooses, the PUB could establish a policy whereby a person who has paid with a bad check drawn as a result of negligence or a deliberate attempt to avoid timely payment may be required to pay his bill by means of cash, money order, certified check or some other similar instrument. All that the Constitution requires is fundamental fairness; where due process requirements must be adhered to, the scope and form of the required hearing can vary according to the nature and importance of the interests and proceedings involved. See Fuentes v. Shevin, 407 U.S. 67, 82, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). Thus, the Defendants retain a great deal of flexibility and discretion in drawing up procedures that will in fact comply with the dictates of due process.

## III. THE DEFENDANTS' LIABILITY FOR DAMAGES

The Defendants in this case make the argument that they cannot be held liable for damages because they neither committed nor directed the commission of any act against the Plaintiff which caused him any injury, and because no bad faith on their part has been shown. In addition, the Defendants herein contend that the Plaintiff's utilities were disconnected because of his own wrongful conduct, and that he cannot recover for what in essence was his own wrong. This Court has considered these arguments carefully and has concluded that, for the most part, they lack appreciable merit.

█ With respect to actions brought pursuant to 42 U.S.C. § 1983, it has been clearly established that a superior who directs, orders or approves of the acts of subordinates can be held liable for those acts if they result in a deprivation of a constitutional right. See Ford v. Byrd, 544

F.2d 194, 195 (5th Cir. 1976). To incur liability under § 1983, a governmental official need not *directly* subject a person to a deprivation of his constitutional rights; it is enough if the official *causes* the plaintiff to be subjected to such deprivation. *See McCollan v. Tate*, 575 F.2d 509, 512 (5th Cir. 1978). Furthermore, in *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court declared that local governing units could be directly sued under § 1983 for monetary, declaratory or injunctive relief where the allegedly unconstitutional action implements or executes a policy statement, ordinance, regulation or decision officially adopted and promulgated by the proper officials. *Id.*, at 690, 98 S.Ct. 2018. In addition, the Supreme Court noted that its holding that local governments can be sued under § 1983 necessarily decided that local governmental officials sued in their official capacities are "persons" under § 1983 in those cases where a local government would be suable in its own name. *Id.*, at 690 n. 55, 98 S.Ct. 2018. Thus, *Monell* makes it perfectly clear that local governmental officials may be sued and held responsible under § 1983 in their official capacities when execution of official policy or custom inflicts the injury involved in a plaintiff's complaint.

In the instant case, the stipulations leave no doubt that the water and electricity services of the Plaintiff were disconnected pursuant to the written policy of the PUB. As discussed above, this termination occurred without notice and without any opportunity to be heard, violating the constitutional rights of the Plaintiff. Since the deprivation of Mr. Bradford's right to due process was accomplished in accordance with PUB's written policy, and since that policy was promulgated, approved authorized or implemented by the Defendants in this case, those Defendants can be held liable to the Plaintiff for his damages.

Of course, this Court is fully cognizant of the fact that while governmental officials have been exposed to liability for damages under § 1983 in some circumstances, the Courts have consistently construed § 1983 as not intending complete revocation of all common-law immunities afforded to such officials. *See, e. g., Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); *O'Connor v. Donaldson*, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975); and *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). As noted in *Scheuer v. Rhodes, supra*, 416 U.S at 247–248, 94 S.Ct. at 1692:

> These considerations [involving the reasons for and the range of the discretion exercisable by certain levels of executive officials] suggest that, in varying scope, a qualified immunity is available to officers of the executive branch of government, the variation being dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based. It is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good-faith belief, that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct.

The Defendant officials involved in the present lawsuit have very serious and extensive responsibilities in their role as the governing and managing body of the PUB. Their official activities often involve the exercise of considerable discretion; they must carefully weigh many conflicting factors and interests in formulating long-term public utility policies vital to the well-being of the citizens of Brownsville. Officials and managers such as the Defendants herein should not be unfairly placed in the position of being held liable for every action that is subsequently determined to have been violative of a customer's constitutional rights, especially if what is involved is determined to be a mistake made in good faith in the course of exercising legitimate discretion within the scope of official duties. *See Wood v. Strickland, supra*, 420 U.S. at 319, 95 S.Ct. at 999. It is this Court's belief that the same rationale for granting qualified

immunity to prison, police, school, hospital and other governmental officials is equally applicable to the Defendants in the instant case.

▇▇▇ Coming to this conclusion does not terminate this Court's inquiry, however, for even the qualified immunity available to officials under such cases as *Scheuer, Wood* and the rest cannot be used as a shield against liability in every case. If the officials involved knew or reasonably should have known that their actions would violate another person's constitutional rights, or if they took action with the malicious intent to cause a deprivation of constitutional rights or other injury, then the qualified immunity defense would be unavailable to those officials. *Wood v. Strickland, supra,* at 322, 95 S.Ct. at 1001.

In the case of *Procunier v. Navarette,* 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978), the Supreme Court noted that there are two branches to the rule announced in *Wood.* Under the first branch, the qualified immunity defense is not available to officials if: *one,* the constitutional right allegedly violated was clearly established at the time of the officials' challenged acts; *two,* the officials knew or should have known of the right involved; and *three,* the officials knew or should have known that their acts violated the constitutional rule. *Id.,* at 562, 98 S.Ct. 855.

▇▇▇ In the instant case, it is this Court's opinion that the Defendants herein cannot successfully invoke the qualified immunity defense, since those Defendants reasonably should have known that their actions in formulating, approving or implementing a no-notice termination procedure would violate the clearly established constitutional rights of the customers affected. To begin with, even a brief look at the case law available at the time the procedure was established strongly supports the conclusion that at the time of the events in the instant case there was a clearly established constitutional right to notice and hearing prior to the termination of utility services. *See, e. g., Davis v. Weir,* 497 F.2d 139, 143 (5th Cir. 1974) (due process demanded pretermination notice by city water department to actual user of water, irrespective of notice to user's landlord); *Palmer v. Columbia Gas of Ohio, Inc.,* 479 F.2d 153 (6th Cir. 1973) (operations of gas company held to be state action, and company required to adhere to due process requirements of notice and hearing prior to termination of services); *Craft v. Memphis Light, Gas & Water Division,* 534 F.2d 684, 687 (6th Cir. 1976), aff'd 436 U.S. 1, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978) (claims to continued utility service constitute property for the purposes of due process, and due process with regard to termination procedures requires notice and an opportunity to be heard at a meaningful time and in a meaningful manner); *Koger v. Guarino,* 412 F.Supp. 1375, 1386 (E.D. Penn.1976) aff'd mem. 549 F.2d 795 (3rd Cir. 1977) (once a system of water service is established by governmental officials, a user thereof has a legitimate claim of entitlement to continued service absent sufficient cause for termination consistent with the procedural protections of due process); *Hattell v. Public Service Company of Colorado,* 350 F.Supp. 240, 245 (D.Colo.1972) (charges that a public utility violated customers' rights to procedural due process by cutting off gas and electric service without any hearing or provision therefor involved state action within the civil rights statute and gave federal jurisdiction in the lawsuit); *Bronson v. Consolidated Edison Co. of New York, Inc.,* 350 F.Supp. 443, 446–447 (S.D.N.Y.1972) (once government undertakes to provide a service to its citizens, it must comply with the requirements of due process before it can terminate the service as to any individual; electric service is a vital service, and termination thereof must comply with due process, including the giving of notice and an opportunity to be heard); *Lamb v. Hamblin, supra,* at 64 (municipal water service must establish procedure whereby users threatened with termination are notified and afforded an opportunity to be heard before service is disconnected); *Limuel v. Southern Union Gas Company, supra,* at 969 (gas utility enjoined from terminating service to customers who wish to contest accuracy of bill without affording customer involved written notice

and opportunity to be heard); *Donnelly v. City of Eureka, Kansas,* 399 F.Supp. 64, 67 (D.Kansas 1975) and *Uhl v. Ness City, Kansas,* 406 F.Supp. 1012, 1018 (D.Kansas 1975) (when municipality is sole source of water service, this service becomes a constitutionally protected entitlement, and the termination thereof must be accomplished in accordance with due process procedures); and finally, *Dawes v. Philadelphia Gas Commission,* 421 F.Supp. 806, 817 (E.D.Penn.1976) (termination of gas service is a grievous interference with a constitutionally protected property interest, requiring some sort of pretermination safeguards). Given the existence of these cases and the fact that legal advice was and is readily available to the Defendants in their official capacities, the Defendants herein clearly should have known of the right their customers had to notice and an opportunity to be heard prior to termination before they put the challenged policy into effect. In expressly establishing such a no-notice termination procedure, the Defendants, if they did not in fact know, should have known that they were violating the above constitutional rule. Therefore, under the first branch of the doctrine developed in *Procunier, supra,* this Court believes Defendants are precluded from invoking the qualified immunity defense.

▆▆▆ Assuming for the moment that the above conclusion had not been made, the Defendants would still not be able to assert the qualified immunity defense established by the previously mentioned cases. Under the second branch of the rule explained in *Procunier,* no matter what the objective state of the law is, governmental officials may still be held liable if they have acted with malicious intent to deprive the complainant of a constitutional right or to cause him "other injury." *Procunier v. Navarette, supra,* 434 U.S. at 566, 98 S.Ct. at 862. The Fifth Circuit Court of Appeals has in a recent case further explained this second prong of the official immunity defense developed in *Procunier,* declaring that the malicious intent prong of the official immunity defense must be read to require proof that: an official either actually intended to do harm to the plaintiff, *or took an action*

*which, although not intended to do harm, was so likely to produce injury that the harm can be characterized as substantially certain to result.* The spirit of the rule reaches nonfeasance as well as misfeasance. It does not insulate an official who, although not possessed of any actual malice or intent to harm, is so derelict in his duties that he must be treated as if he in fact desired the harmful results of his inaction. At the same time, however, the test requires that a plaintiff show that the official's action, although labeled as 'reckless' or 'grossly negligent,' falls on the actual intent side of terms, rather than on the side of simple negligence. *Bogard v. Cook,* 586 F.2d 399, 412 (5th Cir. 1978) (emphasis added).

It is this Court's view that, under the rule announced in *Procunier* and explained in *Bogard,* the Defendants in this case have acted in such a manner as to forfeit the defense of qualified immunity. The action taken in establishing, approving or implementing a policy resulting in the termination of such vital services without notice was an action so likely to produce injury that harm was substantially likely to result from it. There can be no doubt that the policy was an intentional one, and that carrying it out would result in the sudden and complete cessation of water and electric service. The fact that no notice whatsoever was to be given under the expressed policy of the PUB indicates to this Court that the Defendants' official actions in adopting or implementing this policy was more than mere negligence; at best, the policy was deliberately reckless.

▆▆▆ As a final note in reference to the Defendants' argument that Mr. Bradford is not entitled to recover for his own wrong, it must be pointed out that the right to due process is a right possessed by every person who faces loss or impairment of a protected interest, whether or not the person facing the loss is guilty of some intentional misconduct. *See e. g., Goss v. Lopez, supra.* The wrong involved in the instant case was the denial of Mr. Bradford's constitutional right to due process, not the

drafting of a bad check. The circumstance that Mr. Bradford did in fact write a check on a long-closed checking account to pay a utility bill, even if accomplished with all of the deliberate and fraudulent intent Defendants assert Mr. Bradford had when he did so, does not relieve the Defendants of their liability for depriving Mr. Bradford of his due process rights. Indeed, it is highly probable that had Mr. Bradford been given notice of the proposed disconnection and the reason therefor, and been afforded reasonable opportunity to respond to the notice, the matter would have been satisfactorily resolved without termination of the essential services involved. Under the circumstances of this case and in light of the applicable law, Mr. Bradford is at least entitled to nominal damages and the opportunity to show actual damages. *See Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978).

## IV. CLASS CERTIFICATION

The Plaintiff in this lawsuit seeks to represent all persons in the City of Brownsville, Texas, who are customers of the PUB and who have had their utility services terminated or are threatened with such termination without adequate due process safeguards. After carefully reviewing all of the materials presently on file, this Court has concluded that all of the prerequisites to a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure have been met, and that this lawsuit should be certified as a class action.

■ With respect to the requirements found in Rule 23(a), the pleadings in the case and the stipulations submitted by the parties make it clear that the proposed class is so numerous that joinder of all members is impracticable and that there are questions of law or fact common to the class. According to the stipulations, the PUB receives approximately 90 bad checks a month, while disconnections based upon nonpayment of bills average approximately

2,287 per month. Although variations in the factual situations of individuals in the proposed class undoubtedly exist, the basic issues in the case focus upon the termination procedures of the PUB and the adequacy thereof *vis-a-vis* constitutional requirements of due process. It is also obvious that the claims of the Plaintiff are typical of those of the entire class, in that he is asserting the right to adequate notice prior to any termination of services and the right to an adequate opportunity to contest the disconnection. Finally, this Court is convinced that the representative plaintiff will fairly and adequately protect the interest of the class; nothing in the record indicates anything to the contrary, and the Defendants have not seriously challenged the adequacy of the Plaintiff as a representative of the proposed class.

■ Of course, to have a valid class action, the lawsuit must not only satisfy the requirements of Rule 23(a), but must in addition satisfy at least one of the prerequisites found in Rule 23(b). In the instant case, Rule 23(b)(2) is clearly applicable, in that the party opposing the class has acted or refused to act on grounds generally applicable to the class, making final declaratory and injunctive relief with respect to the entire class both appropriate and necessary.[6] The termination policies of the utility service operated by the Defendants herein apply to all of the proposed class members, and it is those policies that are at the heart of this case.

*Koger v. Guarino, supra,* involved contentions that the termination procedures of the Philadelphia water department violated standards of due process in failing to provide for adequate notice and opportunity to be heard. The district court in that case certified the suit as a class action pursuant to the provisions of Rule 23(a) and (b)(2), defining the class as all users of water in Philadelphia who either actually had their water service terminated or were threat-

---

**6.** This Court's conclusion with respect to the applicability of Rule 23(b)(2) has the further effect of finding that the notice requirements contained in Rule 23(c)(2) are inapplicable in the instant case. *See Eisen v. Carlisle & Jac-* *quelin,* 417 U.S. 156, 177 n. 14, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974); *see also Wetzel v. Liberty Mutual Insurance Co.,* 508 F.2d 239, 253 (3rd Cir. 1975), *cert. den.* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975).

ened with such termination without adequate due process safeguards. *Id.,* at 1380. In so certifying the class, the Court noted that since the defendants had displayed a similar unwillingness to act to provide adequate notice and a hearing prior to termination with respect to all users of the water service, their refusal to implement adequate due process procedures constituted an issue common to all class members, satisfying the requirements of Rule 23(b)(2). In the instant case, as in *Koger,* the named plaintiff was injured by and seeks to invalidate the inadequate notice and hearing policies employed by the provider of utility services. This Court can perceive no reason why class certification is any less justifiable in the present case than it was in *Koger. See also Dawes v. Philadelphia Gas Commission, supra* at 813; *Limuel v. Southern Union Gas Company, supra,* at 970; *Stanford v. Gas Service Company,* 346 F.Supp. 717, 722 (D. Kansas 1972); and *Lamb v. Hamblin, supra,* at 61.

It has been noted that the propriety of certifying a lawsuit as a class action can seldom be determined on the basis of the pleadings alone, and that an evidentiary hearing on a motion seeking certification is ordinarily required. *See King v. Gulf Oil Company,* 581 F.2d 1184, 1186 (5th Cir. 1978). In the instant case, however, the record contains sufficient evidentiary material to permit this Court to conclude that class certification is appropriate. In addition, a decision to certify a lawsuit as a class action is not one carved in stone; circumstances can develop justifying a reevaluation of the certification decision. *See, e. g., Guerine v. J. & W. Inv., Inc.,* 544 F.2d 863, 864 (5th Cir. 1977). Therefore, the Defendants herein will be given an opportunity at the hearing on damages to present whatever arguments and evidence they may have on why this Court should reconsider its ruling herein on the class certification issue. However, if the Defendants do decide to seek such reconsideration, they must submit a brief outlining and supporting their arguments on that issue no later than fourteen (14) days prior to the scheduled hearing.

Based upon the above, it is hereby

ORDERED that the Plaintiff's Motion Requesting This Case To Be Maintained As A Class Action Under Rule 23 F.R.Civ.P. be GRANTED. The class to be certified consists of all customers of the Public Utilities Board of the City of Brownsville, Texas, who have had their utility services terminated or who are threatened with such termination without the protection of adequate due process procedures.

It is further ORDERED that the Defendants' Motion for Summary Judgment be DENIED, and Plaintiff's Motion for Partial Summary Judgment be GRANTED. It is expressly found and declared that the termination without notice of the Plaintiff's water and electric services on November 8, 1977, denied him his constitutional right to due process. It is further found and declared that the PUB's regulations and policies in force and effect on November 8, 1977, insofar as they permitted termination of service without notice and without opportunity to be heard, denied Plaintiff and the class he represents their right to due process of law. Finally, it is further found and declared that the present regulations and policies of the PUB, insofar as they permit termination of utility service for payment with a bad check after only twenty-four hours' notice, and insofar as all termination notices fail to adequately apprise the customers served of a procedure whereby termination can be contested and disputes resolved, continue to violate the applicable standards of due process.

It is also ORDERED that the Defendants, their agents, employees and representatives be permanently enjoined from failing to modify the present regulations, policies and procedures of the Public Utilities Board of the City of Brownsville, Texas, in a manner which will provide adequate due process notice and hearing procedures to all members of the class certified herein. To assure that proper modifications are achieved, it is further ORDERED that the Defendants file with this Court for review and approval proposed modifications of the current termination procedures within thirty (30) days of this Memorandum and Order. The Plaintiff shall have fifteen (15) days from the date the proposed modifications are

filed with this Court to submit whatever comments they may have concerning the proposals. The Defendants should carefully review the procedures mandated by the Courts in the cases of *Palmer v. Columbia Gas of Ohio, Inc., supra,* and *Limuel v. Southern Union Gas Company, supra,* be-

fore submitting the proposed policy changes ordered by this Memorandum and Order.

Finally, it is also ORDERED that a hearing on the amount of damages and attorney's fees [7] Plaintiff is entitled to be held on the 6th day of April, 1979, at 10 o'clock A.M.

7. The granting of Plaintiff's Motion for Partial Summary Judgment has the incidental result of making the Plaintiff a prevailing party to the extent of that Judgment. Ordinarily, a prevailing party in a § 1983 case should recover an award of attorney's fees, unless special circumstances would render such an award unjust. *See Morrow v. Dillard,* 580 F.2d 1284, 1300 (5th Cir. 1978). Some showing must nevertheless be made of Plaintiff's entitlement to such fees and the reasonableness thereof. The factors that need to be considered by this Court on the issue of attorney's fees include the following: one, the time and labor required; two, the skill requisite to properly perform the legal services rendered; three, the preclusion of other employment by the attorney due to acceptance of the case; four, the novelty and the difficulty of the case; five, the customary fee; six, whether the fee is fixed or contingent; seven, the time limitation imposed by the client; eight, the results obtained; nine, the experience, reputation and ability of the attorney; ten, the undesirability of the case; eleven, the nature and length of the professional relationship with the client; and twelve, awards in similar cases. *See Rainey v. Jackson State College,* 551 F.2d 672, 676 (5th Cir. 1977). Therefore, at the hearing ordered by this Memorandum and Order, the Plaintiff must be prepared to submit evidence on each of the above factors, and the Defendants may present any evidence they have on any special circumstances which would make an award of attorney's fees unjustified. In addition, both parties should submit briefs on the issues of damages and attorney's fees, setting forth their position with respect thereto, no later than fourteen (14) days prior to the scheduled hearing.

APPENDIX A

*Exhibit C*

MEMO

TO: Mr. Ghent Carpenter
Mr. Valois Pagan

FROM: Mr. H. E. Hastings, General Manager

DATE: August 30, 1977

This is to confirm our conversation this morning, August 30th, concerning bad check collections. As confirmed in the conversation the procedure will be as follows. Each insufficient check will be charged $3.00. Service will be disconnected for the account that is associated with the bad check with no attempt made to collect the $3.00. It will be up to the customer to come in to the Public Utilities Board Office and re-apply for service. Any deposit that is available will be applied and the account finaled out, and the customer must make new application including a 2 months! deposit as provided for by ordinance in order to re-establish service with the Public Utilities Board.

H. E. Hastings

HEH/ck

STIPULATION EXHIBIT "1"

## APPENDIX B

**UTILITY DISCONNECT NOTICE**

PUB serviceman was here while you were away.

Please contact the Commercial Department within the next twenty-four (24) hours at 744 E. Elizabeth St.

Telephone:   541-6330
             541-6338
             541-6339

### REASONS FOR DISCONNECTION

☐ Non-Payment

☐ Your meter was found tampered with

☐ Your check was returned by the bank

☐ Other: _____

SERVICE WILL BE DISCONNECTED FOR FAILURE TO COMPLY WITH THIS NOTICE WITHIN THE NEXT TWENTY-FOUR (24) HOURS.

PUB Policy C-B, 11-4-77. Approved, 11-21-77.

By: _____ , Serviceman

Date: _____

Time: _____

---

Fecha: _____

Nombre: _____

Dirección _____

Número de cuenta· _____

Número de medidor·   Luz _____ Agua _____

### AVISO DE DESCONECCION DE SERVICIOS

Un representante de PUB vino mientras Ud no estaba.

Favor de llamar al Departamento Comercial dentro de las próximas veinticuatro (24) horas o de venir a la calle Elizabeth No. 744.

Teléfono:   541-6330
            541-6338
            541-6339

### RAZONES PARA DESCONTINUAR EL SERVICIO

☐ Falta de pago

☐ Su medidor ha sido interferido

☐ Cheque devuelto por el banco

☐ Otras razones: _____

SUS SERVICIOS SERAN DESCONECTADOS POR FALTA DE CUMPLIR CON ESTE AVISO DENTRO DE LAS PROXIMAS 24 HORAS.

Reglamento PUB C-B, 11-4-77. Aprobado, 11-21-77.

Por: _____ , PUB

Fecha: _____

Hora: _____

## STIPULATION EXHIBIT "2"

## APPENDIX C

**Public Utilities Board**
P. O. Box 3270 Brownsville TX 78520
5 5 3  4 8 6

| SERVICE ADDRESS | | | | | FUEL ADJ. |
|---|---|---|---|---|---|
| ACCOUNT NO. | | DATE READ | DAYS | RATES SP FW | MULT |
| SERV CODE | PREV READ | PRES READ | CONSUMPTION | AMOUNT | |
| EL | | | | | |
| WA | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| GROSS DUE AFTER | GROSS AMT | THIS BILL DUE | NET DUE | | |

*ESTIMATED          **KEEP THIS PORTION**

Public Utilities Board
P. O. Box 3270
Brownsville TX 78520

PRESORTED
FIRST CLASS MAIL
U.S. POSTAGE PAID
PERMIT NO. 314

**DO NOT STAPLE OR MUTILATE**
5 5 3  4 8 6

| THIS BILL DUE | NET DUE |
|---|---|
| GROSS DUE AFTER | GROSS AMT |

**RETURN THIS STUB WITH PAYMENT**

MAIL PAYMENT:    **PUBLIC UTILITIES BOARD**
P. O. Box 3270
BROWNSVILLE, TX 78520

OR PAY AT ONE OF THE FOLLOWING PAY STATIONS:

| | |
|---|---|
| Lopez Super Mkt. # 1 | 1415 Ringgold |
| Den Russ Pharmacy | 714 W. Elizabeth |
| Lopez Super Mkt. # 4 | 1803 Boca Chica Blvd |
| El Centro Super Mkt. # 1 | 4425 E. 14 St |
| Lopez Super Mkt. # 2 | 2814 Int'l Blvd |
| El Centro Super Mkt. # 2 | Hosp Shopping Center |
| Gonzales Pharmacy | 1200 E. Washington |
| Saldana Food Store | 1144 Int'l Blvd |
| PUB—Commercial Dept. | 744 E. Elizabeth St |
| Lopez Food Store | 278 McDavitt Blvd |

## STIPULATION EXHIBIT "3"

## APPENDIX D

**Public Utilities Board**
P.O. Box 3270
Brownsville, Tx. 78520

1 0 7 5 3 1

| | PRESORTED |
| | FIRST CLASS MAIL |
| | U. S. POSTAGE |
| | PAID |
| | PERMIT NO. 314 |

### REMINDER NOTICE

SERVICE ADDRESS

ACCOUNT NO.    LAST PAYMENT DATE

PAST DUE    ARREARS

Our records show that payment has not been received on this account as of the date of this notice.
Should you wish additional information, please call:

541-6338 from 8:00 AM to 5:00 PM
546-2241 from 5:00 PM to 8:00 AM

If you have recently made payment, please disregard this notice and accept our thanks. Otherwise, we will expect payment within 5 days from this notice, or services will be discontinued without further notice.

**KEEP THIS PORTION FOR YOUR RECORDS**

### REMINDER NOTICE
1 0 7 5 3 1

ACCOUNT NUMBER    TOTAL DUE

**RETURN THIS STUB WITH PAYMENT**

STIPULATION EXHIBIT "4"

## APPENDIX E

### COLLECTION – DISCONNECT ORDER

| ACCOUNT NUMBER | SERVICE ADDRESS | | | DATE OF NOTICE |
|---|---|---|---|---|
| | | | | |

| ELECTRIC METER NO. | WATER METER NO. | LAST PAYMENT DATE | LAST PAYMENT AMT. | AMOUNT TO COLLECT |
|---|---|---|---|---|
| | | | | |

| PAST DUE | 30 DAYS | 60 DAYS | 90 DAYS | TOTAL |
|---|---|---|---|---|
| | | | | |

Our records show that payment has not been received on this account since date shown on "Last Payment Date" box above

Amount shown under "Amount to Collect" must be paid, plus a reconnection charge, before a reconnection can be made

This can be done by calling at our offices at 744 East Elizabeth If you wish additional information by telephone, please call

541-6338 from 8 00 AM to 5.00 PM
546-2241 from 5 00 PM to 8.00 AM

**Public Utilities Board**
P O Box 3270
Brownsville, Tx. 78520

STIPULATION EXHIBIT "5"

## APPENDIX F

## TERMS AND CONDITIONS
## GOVERNING ELECTRIC SERVICE
### FURNISHED BY THE
## PUBLIC UTILITIES BOARD
### BROWNSVILLE, TEXAS

*Exhibit A*

### INTRODUCTION

These terms and conditions have been prepared and published to guide and assist prospective customers of the Public Utilities Board. It is hoped that the information herein contained may prove helpful in securing prompt and efficient service.

### (1) PUBLIC UTILITIES BOARD:

As used in the terms and conditions herein refers to the Public Utilities Board of the City of Brownsville, Texas or to any employee authorized to represent it.

### (2) AREA SERVED:

The area served by the Public Utilities Board includes, but is not limited to the area within the corporate limits of the City of Brownsville, Port Brownsville, the Brownsville Navigation District and the general area outside and within approximately five miles of the corporate limits of the City of Brownsville.

### (3) APPLICATION FOR SERVICE:

The commercial department of the Public Utilities Board will receive all customer requests for service, whether for new service or modifications to present service installations. This department will expedite service applications to insure that connections are made with promptness and dispatch.

All applications for electric service shall be made on the Public Utilities Board standard application form and shall be signed by the customer and accepted by the Public Utilities Board before service will be supplied.

The Public Utilities Board may refuse any applicant indebted to it for service rendered until such indebtedness is paid for or secured to the satisfaction of the Public Utilities Board.

### (4) SERVICE DEPOSIT:

The Public Utilities Board requires a service deposit for each metered connection and may, at its discretion, require a service deposit equal to two average monthly bills for service furnished or to be furnished, as estimated by the Public Utilities Board rate department.

The Public Utilities Board may, at its option, apply the customers service deposit against payment of an unpaid account and customer shall be required and agrees to restore the deposit to its original amount as a condition of continued service.

### (5) DISCOUNTINUANCE OF SERVICE:

Upon discontinuance of service, the Public Utilities Board shall have not less than 24 hours to make the final meter reading.

Upon discontinuance of service, any portion of the customers deposit not applied to the unpaid balance shall be promptly refunded to the customer.

### (6) RATE SCHEDULES:

Rate schedules will be on file at the Public Utilities Board commercial office and copies may be obtained by the customer on request.

The Public Utilities Board rate schedules will be applied in accordance with and subject to the limitations as indicated in each rate schedule.

The Public Utilities Board will, at the request of the Customer, advise with and explain to Customer the conditions under which each rate is available and its application to the service requirements of the customer.

A Customer having selected or agreed to an applicable rate for the service will not be entitled to a different rate for his service unless and until he so requests in writing; however, he may not change to another available rate within the next succeeding twelve months period unless there is a substantial change in the character or condition of his operations and the service used by him.

### (7) MONTHLY BILLS

Bills for service will be rendered monthly for each meter connection unless otherwise specified. The term "month" for billing purposes shall mean the period between any two consecutive readings of the meters by the Public Utilities Board, such readings to be taken as near as practicable every thirty days.

Monthly bills are due when rendered and are payable on or before the "Due Date" shown on the face of the bill at the Public Utilities Board collection office and/or anyone of its collection substations. Bills not paid by the "Due Date" are considered gross bills and will carry a 10% late payment charge.

Failure to receive a bill in no way exempts a customer from payment of bill or payment of the 10% late payment charge if applicable.

When the Public Utilities Board is unable to read a meter, after reasonable effort, the Customer will be rendered an estimated bill which will be the average of the last three previous monthly bills and the billing adjusted when the meter is read.

### (8) CUSTOMERS SERVICE ENTRANCE:

Customer shall provide a point of connection on his premises or building for overhead distribution systems sufficiently high above ground level that the clearance required by City Ordinance and/or the National Electric Code can be maintained as to the service extension.

Customer shall provide at a point on his premises to be agreed upon, a suitable outside location for the installation of meters and such other equipment as the Public Utilities Board may deem necessary to enable it to deliver power and energy hereunder and properly protect the PUB's property on customers premises and permit no one to inspect or tamper with PUB's wiring, meters and equipment except authorized employees of the Public Utilities Board.

Customer service entrance shall be so arranged that PUB can measure customers entire electric service with one meter unless otherwise specified or indicated by the special nature of the installation.

Customer shall, without exception, provide free of cost to PUB, all easements, rights of way and convenient access on and over customers premises for the extension and furnishing of service by the Public Utilities Board. Authorized employees of the PUB shall have free access at all reasonable hours to the premises of the customer for the purposes of inspecting wiring, equipment, reading and checking meters, the removal of Public Utilities Board equipment and for all other purposes incident to furnishing and providing of service. The Public Utilities Board does not, however, assume any duty or responsibility of inspecting the customers wiring or electrical equipment and will not be responsible therefore, and it is particularly understood that the Customer assumes full responsibility for electric energy furnished him at and past the Point of delivery, described as being the point where the electric energy first leaves the line provided and owned by the company and enters the line provided and/or owned by the customer, and shall protect and save harmless the Public Utilities Board from all claims for injuries and damages to persons and property occurring upon the premises of Customer except where it is shown that the negligence of the Public Utilities Board or its employees was the sole proximate cause of such injury or damage.

The Public Utilities Board at its option shall have the right to inspect any and all electrical installations served by it. Electrical service connections shall be made only after final inspection and approval by the City Electrical Inspector.

All electrical installations shall conform to the requirements of the City Electrical Ordinance and/or the National Electric Code.

### (9) LIMITATION OF LIABILITY:

The Public Utilities Board will not be responsible or liable for injuries and/or damages caused by or resulting from failure to furnish electric energy and service of any kind and amount contracted for and/or for injuries and damages resulting from the performance or non-performance of any acts or things by the Public Utilities Board required of it in or anywise connected with the furnishing of energy and service by the Public Utilities Board, unless it be shown that the negligence of the Public Utilities Board or its employees was the sole proximate cause of the injury or damage complained of.

### (10) EXCLUSIVE SERVICE:

Except in those cases where Customer has a contract with the Public Utilities Board for reserve or auxiliary service, no other source of electricity or power shall be used by the Customer on the same installation in conjunction with the Public Utilities Board service.

### (11) LOADS IMPAIRING SERVICE:

Customer shall not install electrical equipment with characteristics which may cause serious voltage fluctuations interfering with the service of the Public Utilities Board to its other customers. In such cases the Public Utilities Board may decline to serve such equipment until customer has provided, at his expense, suitable apparatus to hold to reasonable limits the effect of such fluctuations.

### (12) IMPROPER OR UNSAFE INSTALLATION:

Electric service is rendered to the Customer with the understanding that he will not utilize any appliance or device which is not properly constructed, controlled and protected, or which may adversely effect service rendered to him or to other customers. The Public Utilities Board assumes no responsibility whatsoever for any portion and/or part of the Customers installation.

### (13) TEMPORARY SERVICE:

Temorary service is that required for construction work, carnivals, circuses, fairs, etc. The Customer shall pay in advance for such temporary installations needed to render or supply the service. Charges shall be based on the cost of materials and labor required for the installation and the removal of same.

(Over)

## STIPULATION EXHIBIT "6"

## (14) CHARACTERISTICS OF ELECTRIC SERVICE:

### A. — GENERAL

The Public Utilities Board supplies alternating current having a nominal frequency of 60 cycles per second. It operates an ungrounded closed Delta distribution system.

It is essential that the Customer obtain from the Public Utilities Board the exact characteristics of the available service before proceeding with the design and purchase of electrical equipment.

### B. — STANDARD VOLTAGE CHARACTERISTICS

The decision as to the voltage characteristics of electric service to be supplied at a given location should be made only after discussing the matter with the Public Utilities Board.

The Public Utilities Board will supply single phase service at 120/240 volts three wire for ordinary lighting loads, household equipment, general appliances and motors of less than five (5) horse power.

Three phase service for power loads will be supplied at the following standard voltage levels:

| Secondary Service | 120/240 | Volts 3 Wire Delta |
| Secondary Service | 120/240 | Volts 4 Wire Delta |
| Secondary Service | 240/480 | Volts 4 Wire Delta |
| Secondary Service | 2,300 | Volts 3 Wire Delta |
| Primary Service | 12,470 | Volts 3 Wire Delta |
| Primary Service | 69,000 | Volts 3 Wire Delta |

### C. — AVAILABILITY THREE PHASE POWER

Three phase power is not available in all areas served by the overhead distribution, therefore customers should consult with the Public Utilities Board before purchasing of equipment or the wiring of buildings for same.

## (15) TRANSFORMER INSTALLATIONS:

Where large power loads are encountered, service considerations may dictate the installation of distribution transformers on the Customers property. Transformers and accessory equipment may be located on poles, fence enclosed concrete slabs or in vaults as determined by the Public Utilities Board, due consideration being given to special circumstances pertaining to the installation.

Where it is necessary to install a transformer bank on Customers property, the Public Utilities Board will install the bank on a pole structure. If the transformers are too large for a pole structure installation, the Public Utilities Board will install the transformers on a fenced concrete slab constructed and furnished by the Customer and built to the specifications as supplied by the Public Utilities Board. The Public Utilities Board shall however install the pole structure for dead ending the aerial primary and for supporting the primary bus work. The Customer shall furnish and install secondary service entrance conductor to the secondary bus of the transformer station.

The Public Utilities Board will supply and maintain transformers, metering equipment and all facilities without cost up to the connection to Customers service entrance conductors.

## (16) PRIMARY SERVICE:

Customers desiring primary service shall assume all responsibility for furnishing, installing, maintaining,and operating all facilities on the Customers side of the point of delivery. The point of delivery shall be at a point determined mutually by the Public Utilities Board and the Customer; generally however, it shall be at the Customers property line nearest to existing primary facilities.

The Public Utilities Board shall furnish, install, maintain and operate the primary metering equipment and all facilities up to the point of delivery.

To provide maximum continuity of service, it is important that Customers taking primary service consult with the Electrical Distribution Department of the Public Utilities Board on such engineering aspects as voltage levels, fault currents, relay co-ordination, etc.

## (17) UNDERGROUND DISTRIBUTION SERVICE:

The Public Utilities Board does not maintain an underground distribution system, it will however provide secondary service to those Customers desiring such service, charging for same, the differential cost between an aerial installation and the underground system.

Where an underground installation is required because special circumstances will not permit an aerial installation, the Public Utilities Board will charge Customer for the cost of the cable conduit and cable if same is supplied by the Public Utilities Board.

Whenever a builder, developer or subdivider wishes to have installed an underground primary and/or secondary distribution system within a subdivision, he shall submit plans, details and specifications to the Eelectrical Distribution Department of the Public Utilities Board for review and approval.

Upon approval of such plans by the Public Utilities Board an estimate shall be made of the comparative cost of an aerial versus underground installation. Subdivider or builder shall then pay the Public Utilities Board in advance the difference in cost as determined prior to the commencement of work by the Public Utilities Board.

## (18) SERVICE EXTENSIONS:

Service will be extended and supplied to each customer without cost by a standard overhead service installation. Where it is necessary to supply electric service and locate a pole or poles on private property, only the first pole and wire span, which is considered to be 300 feet, will be furnished without cost by the Public Utilities Board. All poles and wire spans beyond the first pole shall be furnished at the customers expense and shall become his property.

## (19) METERS:

The amount of energy supplied to the Customer shall be determined by means of an integrating watthour meter of approved type and the readings thereof shall be deemed conclusive evidence as to the quantity of energy supplied hereunder, unless upon testing, meter is found to register inaccurately and its error shall exceed two (2) percent.

Any meter found inaccurate by more than 2% will be adjusted and/or replaced if necessary.

The Public Utilities Board shall furnish without cost and install meters and metering equipment of proper type and capacity to measure electric service used by Customer.

Should any meter fail to register the electric power and energy delivered, the period of failure shall for billing purposes be estimated from the best information available.

Tampering with or interfering with the meter and/or conductors to carry unmetered current, or the breaking of meter seals is strictly prohibited.

All residences and dwellings shall be individually metered. No electric energy shall be metered by any customer for resale purposes.

The installation and removal of electric watthour meters shall be by Public Utilities Board authorized personnel only. All meters shall be located out-of-doors away from moving machinery or other hazardous locations.

## (20) IDENTIFICATION OF METERS:

Where more than one meter is installed in a single location each meter loop and switchbox shall be carefully marked to indicate the exact address, apartment number and building served. Marking such as front, rear, east, west, etc., are not acceptable.

## (21) LARGE POWER INSTALLATIONS:

Large power installations shall be by contract and dealt with separately. The Public Utilities Board may at its discretion require a customer to guarantee an annual minimum bill for a period of years to amortize the installation investment.

## (22) MOTORS:

All electric motors installed on the Public Utilities Board system shall have the name plate voltage and frequency rating compatible with PUB's nominal supply voltage and designed to operate successfully at rated load with variation in supply voltage of not more than 10% above or below the name plate voltage in accordance with NEMA specifications.

All motors shall be properly equipped with protective devices which may include time delay fuses, circuit breakers, low voltage relays, etc. Three phase motors and circuits shall be protected by phase fault detectors to prevent "single phasing."

## (23) RADIO AND TELEVISION ANTENNAS:

Antennas or aerials for radio or television sets shall not be erected over or under the Public Utilities Board power lines, nor are they to be attached to or near PUB's poles, substation or other equipment.

## (24) POWER FACTOR:

Customers having a connected load exceeding 300 KVA shall maintain an average power factor of not less than eighty five (0.85) per cent. Any customer whose power factor consistantly averages less than 85% will be requested to furnish at his expense such equipment as will correct the low power factor condition.

The Public Utilities Board will assist and advise Customer of type and size of corrective equipment to use and will make the installation at its expense.

## (25) FLUORESCENT AND GASEOUS LIGHTING:

Fluorescent or gaseous tube lighting installations shall be made with a corrected power factor of not less than 90%. This applies to new installations and modifications to old installations.

Corrective equipment shall be installed in the circuit between the lighting devices and the switch controlling the devices, in such manner that the corrective equipment will function only when the lighting devices are operated.

## (26) DEMAND:

Demand is defined as the maximum rate at which a Customer takes energy from the electric system. The maximum demand shall be the average measured rate of energy usage during any 15 minute period of the billing period.

## (27) GENERAL:

It is not expected that the terms and conditions quoted herein will cover all circumstances of service application, connections and/or installations which may arise. Where conditions arise not specifically covered herein, an authorized and qualified employee of the Electrical Distribution Department of the Public Utilities Board may be contacted for aid and assistance.

The Public Utilities Board may at its discretion from time to time and in accordance with the need, amend the Terms and Conditions herein quoted.

PUBLIC UTILITIES BOARD
OF THE CITY OF
BROWNSVILLE, TEXAS

APPENDIX G

*Exhibit D*                MEMO

TO:  Mr. Ghent Carpenter

FROM: Mr. H. E. Hastings, General Manager

SUBJECT:  Credit Policy on Re-Connections

DATE:  March 29, 1977

When our customers are disconnected because of non-payment, some of them ask for additional time in which to pay their total bill.

It will be our policy to offer them an arrangement calling for the total amount to be paid within a period of not more than sixty (60) days.  This arrangement must be in writing and must be signed by the customer.  It must be complied with to avoid another cut off.  The re-connection charge must be collected, and at the same time, a substantual payment should be made on the amount due.

Customers who have re-connected themselves after having been cut off are not eligible for this arrangement.

Neither are those customers who are habitually disconnected for non-payment, thus indicating a bad credit status. Please refer to our memo of March 23, 1977, requiring two months deposit on customers so involved.

Implementation of this policy will call for good judgment and careful analysis of each individual case.

H. E. Hastings

HEH:gc

STIPULATION EXHIBIT "7"

# APPENDIX H

Public Utilities Board  *Exhibit B*  Policy No:  C-B 11-1-77
City of Brownsville Texas  Effective:  11-21-77

SECTION B:  RULES AND REGULATIONS GOVERNING ELECTRIC SERVICE
COLLECTION AND DISCONNECT POLICY

## I. GENERAL PUB OBJECTIVE

It is the policy of PUB to be fair and consistent in collecting all money due to PUB in conformity with all federal, state, and city laws and in a manner that enables PUB to build or retain the maximum customer goodwill.

## II. ELECTRIC SERVICE BILLS

A. All electric service bills for active accounts are rendered monthly.

B. The net due date of the bill will be fifteen (15) calendar days after issuance.

C. A bill not paid on or before net due date will be considered delinquent and will be penalized in an amount equal to 10% of the total net amount.

## III. PROPER NOTICE OF DISCONNECTION

Proper notice of disconnection shall consist of a delinquent reminder and cut-off notice by mailing or hand delivery at least five (5) calendar days prior to a stated date of disconnection.

## IV. DISCONNECTION OF ELECTRIC SERVICE

A. Electric service may be disconnected with proper notice for any of the following reasons:

1. If the bill has not been paid within twenty (20) days from date of issuance,

OR

A deferred payment agreement has not been entered into within twenty (20) days from date of issuance,

AND

Proper notification of disconnection has been given to customer.

2. Failure to comply with terms of a deferred payment agreement.

## STIPULATION EXHIBIT "8"

Public Utilities Board                           Policy No:  C-B 11-2-77
City of Brownsville Texas                        Effective:  11-21-77

   3.  Violation of PUB's Terms and Conditions.

   4.  Failure to comply with deposit or guarantee
       arrangements to secure payment of bills.

   5.  Tampering with the utilities PUB's meter or
       equipment.

   6.  Where a known dangerous condition exists.

   B.  Unless the customer requests disconnection, service will
       not be disconnected on a day, or in the afternoon im-
       mediately preceding a day, when personnel of PUB are not
       available to the public for the purpose of making col-
       lections and reconnecting service.

## V.  RECONNECTION OF SERVICE

A.  If a customer's service has been disconnected for any reason
    shown in Section IV.A of this policy, a reconnection charge will
    be added to the account and collected along with any delinquent
    bill before service is restored.

B.  PUB will charge a $5.00 reconnect charge during normal business
    hours (8:00 AM to 5:00 PM), or $10.00 after normal business
    hours.  If a service has been disconnected at the pole, such
    fee shall be double the otherwise applicable fee.

C.  Should unusual circumstances exist in the reconnection of a
    customer, the General Manager has the authority to charge a
    proper fee in relation to the expense involved in making the
    reconnection.

## VI.  DEFERRED PAYMENT PLAN

A.  In cases where extraordinary conditions exist in the relation-
    ship between PUB and a customer such as billing disputes,
    equipment disputes or unique personal problems, and abnormally
    high bills have accumulated as a result, the General Manager
    may enter into a deferred payment plan in the event the eligi-
    ble customer is absolutely unable to pay the outstanding bill
    in full.

B.  If PUB enters into a deferred payment plan with a customer,
    the plan will provide that:

   1.  Service will not be disconnected if the customer pays
       current bills.

                              AND

   2.  A reasonable amount of the outstanding bill.

Public Utilities Board                    Policy No:   C-B 11-3-77
City of Brownsville Texas                  Effective:   11-21-77

AND

>  3.  Agrees to pay the balance in reasonable installments
>      as might be determine by the General Manager, until
>      the bill is paid.

C.  The deferred payment plan offered by PUB will be in writing
    and will state, immediately preceding the space provided for
    the customer's signature, in bold-face print at least two
    size's larger than any other used there and that:

>  1.  If you are not satisfied with this agreement, do not sign.

AND

>  2.  If you do sign this agreement, you give up your right to
>      dispute the amount due under the agreement except for the
>      utilities's failure or refusal to comply with the terms of
>      this agreement.

D.  For the purpose of determining a customer's eligibility under
    the plan, the following should be considered:

>  1.  Customer's payment history
>  2.  Customer's ability to make installment payments in addition
>      to payment of current bill.
>  3.  Size and length of time of the outstanding debt.
>  4.  Reasons for the customer's inability to pay outstanding debt.

E.  If a customer enters into a deferred payment agreement with PUB
    and fails to comply with the terms of the agreement, constitut-
    ing default on the part of the customer's, PUB has the right
    to disconnect, as provided in Section IV.

F.  PUB shall not refuse a customer participation in the deferred
    payment plan because of race, color, creed, sex, or marital
    status.

## VII.  RETURNED CHECKS

A check that has been returned from the bank and has been redeemed
by PUB will be charged back to the customer's account and a $5.00
fee added to the account for processing the check.

A.  PUB will observe the following procedure:

>  1.  Proper notice to the customer through:
>
>     (a)  mail
>     (b)  hand delivery (door knob)
>     (c)  telephone

Public Utilities Board                      Policy No:  C-B 11-4-77
City of Brownsville Texas                   Effective:  11-21-77

   2.  Twenty four (24) hours will be granted to customers
      to clear the check.

   3.  Service will be discontinued after failure from
      customer to clear check within twenty four (24) hours.

   4.  Customer will have to comply with Policy C-A 11-77
      Section A "Customer Deposit Policy."

   5.  A reconnection charge will be added to the account as
      per Article V of this procedure.

   6.  PUB will reserve the right to accept checks as a mode
      of payment from customers whose checks are bounced.

## VIII.  METER TAMPERING

A.  Confirmed cases of meter tampering or diversion of energy in
    which the customer living in a premises receives electric
    service which is un-metered, PUB will observe the following
    procedure:

   1.  Proper notice to the customer through:

      (a)  mail
      (b)  hand delivery (door knob)
      (c)  telephone

   2.  Twenty four (24) hours will be granted to the customer in
      which time contact must be made with the Commercial Depart-
      ment of PUB.

   3.  Service will be discontinued after failure from customer
      to contact PUB within twenty four (24) hours.

   4.  Estimated back billing for un-metered consumption will have
      to be paid in full by the customer.

   5.  Any damage to the property of PUB will have to be paid in
      full by the customer.

B.  In the event of repeated tampering at the same premises and
    diversion of energy at the same premises, PUB will reserve
    the right to remove the facilities and withhold services.