Larry E. FRATES, Plaintiff,

v.

CITY OF GREAT FALLS, Betty J. Noble, and G. Allen Johnson, Defendants.

No. CV–81–117–GF.

United States District Court,
D. Montana,
Great Falls Division.

June 30, 1983.

Howard Strause, Lawrence Anderson, Great Falls, Mont., for plaintiff.

David V. Gliko, City Atty., Great Falls, Mont., for defendants.

## MEMORANDUM

HATFIELD, District Judge.

The plaintiff, a resident of Great Falls, Montana, instituted the present action under 42 U.S.C. § 1983 seeking injunctive relief and damages against the City of Great Falls, the Manager of the municipality, and the supervisor of that municipality's water and sewage department for certain alleged constitutional violations relating to the termination of water and sewage services to the plaintiff's property. The matter is presently before the court on the parties' cross-motions for summary judgment.

## I. BACKGROUND

The City of Great Falls ("City") is a municipal corporation within the State of Montana. As a public utility, the City supplies water and sewage services to the residents of the city under rates and regulations approved by the Public Service Commission of the State of Montana. At all times pertinent to this action defendant Al Johnson was the duly appointed Manager of the City, while defendant Betty Noble was Supervisor of City's Water Department ("Utility Supervisor"). The plaintiff, Larry Frates was, at all times pertinent to this action, the contract purchaser of certain property located at 4611 Second Avenue North, Great Falls, Montana. That property was provided water service through the City's Water Department until the termination at issue.

The factual background upon which this action is predicated is not in dispute, the parties having stipulated to the following facts:

On March 30, 1978, the plaintiff requested the City's Water Department to provide water service to the premises located at 4611 Second Avenue North. The City provided that service through two different taps, referred to herein as taps "A" and "B".[1] Tap A is located on property which, at the time of this request, was being purchased by the plaintiff (hereinafter "plaintiff's property"). Tap B, however, is located on property adjacent to the plaintiff's property and is subject to an easement held by the State of Montana.

As of February 1, 1979, the accounts on both taps A and B were delinquent. The plaintiff disputed the accuracy of both

1. Tap A, as used herein, refers to actual Tap Number 11467, which was later renumbered to Number 114670 for reasons not important to this action. Tap B, as used herein, refers to actual Tap Number 064457, which was later renumbered to 064450.

accounts and so informed the Utility Supervisor. On May 28, 1980, the Utility Supervisor sent a notice of delinquency to the plaintiff, informing him that failure to bring the account to date within ten days would result in termination of service. In response to that notice, the plaintiff went to the office of the Utility Supervisor and complained about the accuracy of the account. The Utility Supervisor advised the plaintiff that the account would be checked for accuracy.

As of September 1, 1981 the account on tap A was paid to date, while the account on tap B was delinquent in an amount in excess of four thousand dollars. The plaintiff, at a time unknown, again contacted the Utility Supervisor concerning his delinquent account, in response to which, the Supervisor prepared a "cycle journal" reflecting the history of the account. Having been contacted by the plaintiff, the Public Service Commission of the State of Montana ("PSC") requested the Utility Supervisor to prepare another "cycle journal", which the Supervisor did in March of 1981. A final notice of delinquency was sent to the plaintiff on March 8, 1981.[2] Water service was thereafter terminated on June 25, 1981.

At the request of the PSC, the City restored water service to plaintiff's property later in the day of June 25, 1981. Sometime subsequent to June 25, 1981, investigators in the employ of the PSC conducted an independent investigation, on behalf of the plaintiff, to determine the accuracy of the disputed account. By letter dated August 4, 1981, the PSC informed both the plaintiff and the City of Great Falls that the investigation confirmed the accuracy of the account. On August 20, 1981, the City Manager directed the City Water Department to terminate services to the plaintiff's premises located at 4611 Second Avenue North.

On August 24, 1981, the plaintiff's premises were physically tagged with a delin-

---

2. The final notice utilized by the City of Great Falls with respect to the plaintiff was as follows:

## CITY OF GREAT FALLS WATER AND SEWER BILL
CIVIC CENTER BLDG. • GREAT FALLS, MONTANA 59401

*A*

# DELINQUENT NOTICE

| TAP NUMBER | OWNER NAME AND ADDRESS | CUSTOMER NUMBER | DATE |
|---|---|---|---|
| CLASS | DIST | | TOTAL DUE |

THE CITY ORDINANCES STATE THAT A PENALTY OF 5% WILL BE CHARGED ON ALL PAST DUE SEWER BILLS.

*B*

YOUR WATER AND SEWER BILL IS **60** OR **MORE** DAYS PAST DUE. OUR RECORDS SHOW THE LAST PAYMENT RECEIVED IN THIS OFFICE WAS MADE ON [ ] IN THE AMOUNT OF [ ]

UNLESS FULL PAYMENT IS RECEIVED WITHIN THE NEXT 10 DAYS, WATER SERVICE WILL BE SUSPENDED WITHOUT FURTHER NOTICE. IF THIS STATEMENT IS NOT TRUE, PLEASE CONTACT THIS OFFICE. ALL PAYMENTS MADE WILL BE CREDITED FIRST TO PENALTY CHARGE AND THEN BALANCE ON TOTAL DUE.

| PAST DUE 60 DAYS AND OVER | TAP NO. | SEWER PENALTY | 30 DAY CLASS | CURRENT DISTRICT | CUSTOMER NUMBER | TOTAL DUE |
|---|---|---|---|---|---|---|

quent notice, which gave notice of the intended termination of services. On August 25, 1981, the PSC again intervened, requesting the City to forestall the termination until August 28, 1981. The City acquiesced in the PSC's request and offered the plaintiff a payment plan. The plaintiff, however, disputing the accuracy of the account, rejected the plan. The plaintiff's premises were again tagged, on August 28, 1981, with termination notices, and on September 1, 1981, water service to tap A was terminated. The termination was accomplished by servicemen entering an unfenced portion of the plaintiff's property, located adjacent to a driveway/parking lot. The standpipe providing access to the valve of tap A is located approximately thirty to forty feet from the driveway.

On September 4, 1981, full water service to the plaintiff's property was restored, pursuant to order of this court. A compromise settlement on all of the plaintiff's accounts was reached between the parties on February 5, 1982.

The plaintiff alleges that the conduct of the defendants, in terminating water service to his property, violated the rights secured him by the First and Fourth Amendments to the United States Constitution, as applicable to the states through the Fourteenth Amendment, and the due process clause of the Fourteenth Amendment.

## II. FOURTH AMENDMENT CLAIM

The plaintiff submits that the September 1, 1981 entry by the defendants' employees upon his premises, for the purpose of terminating water service, was tantamount to an illegal search under the Fourth Amendment. The court disagrees.

■ Reasonableness is the "linchpin" of the Fourth Amendment. The Fourth Amendment only affords protection against unreasonable governmental searches. This principle must be borne in mind whenever one assesses the legality of certain conduct in light of the proscription of the Fourth Amendment. Whether certain conduct is properly denominated an "unreasonable search" must be determined largely by the facts of the particular case. Before the issue of the reasonableness of certain conduct is confronted, however, it must be determined whether that conduct did in fact constitute a search within the scope of the Fourth Amendment. In the matter *sub judice,* that initial query must be answered in the negative.

■ In *Marshall v. United States,* 422 F.2d 185 (5th Cir.1970), the Court stated:

A search implies an examination of ones premises or person with a view to the discovery of contraband or evidence of guilt to be used in prosecution of a criminal action. The term implies exploratory investigation.

422 F.2d at 189 (citation omitted). The conduct under scrutiny in the instant action may not be so defined.

This court is acutely aware of the extension of the Fourth Amendment protection to administrative inspection programs. *See, e.g., Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967); *See v. City of Seattle,* 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967). Critical to the court's rationale in *Camara* and *See,* however, was the fact that violations of the safety and health ordinances at issue were enforced by criminal processes. 387 U.S. at 530–31, 87 S.Ct. at 1731–32. The same is not true in the matter *sub judice.* The intrusion of the plaintiff's premises, at issue here, was for the purpose of terminating water services, and to no extent was it directed at instituting criminal proceedings against the plaintiff. The situation is not one in which government officials embarked on a mission designed to determine whether the subject individuals were in compliance with certain ordinances, violations of which were punishable by fine or imprisonment.

■ This court is not prepared to acknowledge, as plaintiff would have it do, that any warrantless entry upon an individual's property by a person employed by any unit of government, is a search. A simple trespass is not elevated to a search, within the meaning of the Fourth Amendment,

merely because the offender is a government employee.

■ Proceeding one step further, the conduct at issue was entirely reasonable. The intrusion of which the plaintiff complains did not involve an entry of his home or his business. The defendants' agents went upon an unfenced portion of the plaintiff's property, located immediately adjacent to a driveway/parking lot, appurtenant to the plaintiff's commercial business building. Specifically, the water service valve was located between the plaintiff's commercial property and a rental housing unit owned, but not occupied, by the plaintiff. This physical outlay of the property where the intrusion occurred attests to the reasonableness of the intrusion. Furthermore, there is no allegation that the defendants' agents acted in an unreasonable manner in entering upon the property, nor that the entry was a subterfuge to obtain information designed to institute criminal proceedings against the plaintiff. Rather, the entry was made during the working day in an open and unobtrusive manner for the sole purpose of terminating water service to plaintiff's property. The plaintiff erroneously contends that the entry upon his property, in and of itself, was violative of the Fourth Amendment.

The facts admitted by the plaintiff evince that the actions of the defendants' employees in effectuating the termination of the water services to the plaintiff's property were entirely reasonable under the circumstances. The employees entered, openly and unobtrusively, a portion of plaintiff's property easily accessible to the public. The actions of the defendants' employees, even though technically a trespass, did not constitute an unreasonable search within the purview of the Fourth Amendment.

Having rejected the plaintiff's Fourth Amendment claim on the grounds set forth above, the court finds it unnecessary to address the additional contention raised by the defendants concerning the plaintiff's waiver of his Fourth Amendment rights pursuant to the contract for water service entered into with the City.

## III. DUE PROCESS CLAIM

The plaintiff contends that the defendants terminated the water service to his property without affording him notice and hearing, in violation of his right to due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution.

In the case of *Memphis Light, Gas and Water Division v. Craft,* 436 U.S. 1, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978), the United States Supreme Court held that a Tennessee municipal utility violated a customer's right to due process of law when it terminated service, for nonpayment of charges, without affording the customer adequate notice and a hearing. The Court concluded that when state law precludes the termination of utility service other than for good cause, there arises "a 'legitimate claim of entitlement' within the protection of the Due Process Clause." *Id.* at 11–12, 98 S.Ct. at 1561. Accordingly, the Court held that the customer was entitled to a constitutionally adequate notice and hearing procedure prior to termination, in order "to afford reasonable assurance against erroneous or arbitrary withholding of essential services." *Id.* at 18, 98 S.Ct. at 1564.

The Court in *Memphis* reiterated the interplay between the Fourteenth Amendment and state substantive law, stating:

The Fourteenth Amendment places procedural constraints on the actions of government that work a deprivation of interests enjoying the statute of 'property' within the meaning of the Due Process Clause. Although the underlying substantive interest is created by 'an independent source such as state law', federal constitutional law determines whether that interest rises to the level of a 'legitimate claim of entitlement' protected by the Due Process Clause. *Board of Regents v. Roth,* 408 U.S. 564, 577 [92 S.Ct. 2701, 2709, 33 L.Ed.2d 548] (1972); *Perry v. Sindermann,* 408 U.S. 593, 602 [92 S.Ct. 2694, 2700, 33 L.Ed.2d 570] (1972).

*Id.* at 9, 98 S.Ct. at 1560.

Assessing Tennessee decisional law on the subject, the Court found that the customer

had a protected interest in continued service. *Id.* at 11, 98 S.Ct. at 1561. Critical to the Court's conclusion was the fact that utilities in Tennessee could terminate service only for cause. *Id.* at 11, 98 S.Ct. at 1561. Because the Court found that Tennessee law created a "property" interest in continued utility service, it concluded that the procedure for terminating those services must comport with the procedural constraints of the Due Process Clause of the Fourteenth Amendment.

The plaintiff in the instant case claims a similar "legitimate claim of entitlement" as the customer in *Memphis,* to the water service provided by the City of Great Falls in its capacity as a public utility. Accordingly, the plaintiff submits that the defendants were bound, by the Fourteenth Amendment, to provide him with constitutionally adequate notice and hearing prior to the termination of water service to his property.

Disposition of the due process issue requires the court to undertake a three step analysis. First, the court must determine the interest created, under Montana law, with respect to water service provided by a municipally owned utility. Second, applying federal constitutional law, the court must determine whether that interest rises to the level of a "legitimate claim of entitlement" protected by the Due Process Clause. Finally, if the court concludes that the interest created is protected by the Due Process Clause, it must determine whether plaintiff in this matter was afforded due process of law with respect to the termination of his services. Simply stated, the court must determine whether the requirements of the *Memphis* case are applicable here, and whether those requirements were met with respect to the present plaintiff.

### A. *Existence of a Protected Interest*

 Protected interests in property are normally not created by the Constitution, rather, they are created and defined by an independent source such as state statutes or rules entitling the citizen to certain benefits. *Board of Regents v. Roth,* 565 U.S. at 577, 92 S.Ct. at 2709. The United States Supreme Court has emphasized that the hallmark of property is an "entitlement grounded in state law, which cannot be removed except for 'good cause'". *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982); *Memphis Light, Gas and Water Div. v. Craft, supra; Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); *Roth v. Bd. of Regents, supra.* A person's interest in a benefit or entitlement is a property interest protected by the requirements of due process if there are rules or explicit understandings that support the person's claim to the benefit or entitlement. *See, Perry v. Sniderman,* 408 U.S. at 601, 92 S.Ct. at 2699. In light of these propositions, this court must determine whether or not Montana, or the City of Great Falls, has created a substantive interest in continued water services. If it has, the next area of inquiry, as noted, is whether or not that interest rises to the level of entitlement. *See, Memphis Light, Gas and Water Div. v. Craft, supra* 436 U.S. at 9, 98 S.Ct. at 1560.

The defendants have not argued, and in effect have conceded, that under Montana law a water service customer has a legitimate claim of entitlement to continued water service. There exists a paucity of decisional law in Montana, however, on that issue. Indeed the only law extant on the subject is statutory. Nonetheless, a review of the pertinent statutory law supports the conclusion that a customer's expectation of the continued availability of water service from the public utility, managed and controlled by the defendants, is legitimate and is, in fact, secured by existing rules and understandings.

Section 7–13–4301 of the Montana Code Annotated (1979) authorizes municipalities, within the State of Montana, to establish, operate and maintain water supply systems for the benefit of the public. Under the pertinent provisions of state law, termination of services is allowed in two specified instances, *i.e.,* nonpayment of charges and illegal use. §§ 7–13–4306 and 4313, M.C.A. (1979). Likewise, the pertinent ordinance

of the City of Great Falls allows for termination of services only for violations of any of the rules and regulations, contained in said ordinance, or for nonpayment of charges. § 13.08.130 of Great Falls City Ordinance 1475. Such specification of reasons, for which services may be terminated, amounts, in essence, to a recognition that termination may be for cause only, and clearly refutes the conclusion that the utility or governing body has a right to terminate services at will. *See, e.g., Bradford v. Edelstein,* 467 F.Supp. 1361, 1369 (S.D.Tex. 1979).[3]

■ The declaration by the State of Montana, in the pertinent enabling legislation, that municipally owned water service utilities are to be created for the benefit of the public, taken in conjunction with the fact that the services provided by such utilities may be terminated only for cause, establishes that a customer has a justified expectation of continued water service, created and secured by existing state and local law. Accordingly, a customer serviced by a municipally owned water service utility in the State of Montana may assert a "legitimate claim of entitlement" within the protection of the Due Process Clause of the Fourteenth Amendment. *See, Memphis Light, Gas and Water Div. v. Craft,* 436 U.S. at 11–12.

B. *The City of Great Falls' Termination Procedure and the Requirements of Due Process*

In determining whether the process afforded the plaintiff in this case adequately comported with the Due Process Clause of the Fourteenth Amendment, this court is guided by the pronouncements of the Supreme Court in the *Memphis* case. The factual similarity extant between this case

and the *Memphis* case clearly warrants application of the principles espoused in *Memphis* to the present situation.

■ Consistent with the *Memphis* decision, this court reads the Due Process Clause to require, prior to termination of utility services for nonpayment of charges: (i) notice informing the customer not only of the possibility of termination, but also of a procedure for challenging a disputed bill, and (ii) an established procedure for resolution of disputes, or some specified avenue of relief to customers who dispute the existence of a liability. 436 U.S. at 12, 98 S.Ct. at 1561.

a. NOTICE

An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. The notice must be of such nature as reasonably to convey the required information, and it must afford a reasonable time for those interested to make their appearance.

*Mullane v. Central Hanover Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950) (citations omitted).

■ The final notice contained in the City of Great Falls' bills stated that payment was past due, and that service would be suspended if payment was not made within ten days.[4] In addition, the notice stated "[i]f this statement is not true, please contact this office." The notice contained the address of the City's offices. Assessing the notice so provided, in light of the requirements set forth in *Memphis,* it is

---

3. A careful reading of *Memphis* supports the rationale employed by this court in reaching the conclusion that, under Montana law, a municipally owned utility may terminate water service only "for cause". In assessing *Trigg v. Middle Tennessee Electric Membership Corp.,* 533 S.W.2d 730 (Tenn.App.1975), *cert. denied* (Tenn.Sup.Ct. March 15, 1976), the court noted, that because utility service in Tennessee could not be terminated except for nonpayment of a

just service bill, it could not be said that a public utility could terminate service "at will". 436 U.S. at 11, 98 S.Ct. at 1561. Rather, because Tennessee placed a specific limitation upon the right to terminate, the Court concluded that the utility could terminate service only "for cause". *Id.*

4. *See,* n. 2, *supra.*

evident that the notice falls short of the *Memphis* standard.

Like the notification procedure at issue in *Memphis,* the notice of termination utilized by the City of Great Falls adequately apprises a customer of the threat of termination, and provides a reasonable time within which a customer can render payment to avoid termination of service. The notice, however, is not "reasonably calculated" to inform a customer of the availability of "an opportunity to present [his] objections" to his bill. *Memphis Light, Gas and Water Div. v. Craft,* 436 U.S. at 14, 98 S.Ct. at 1562. This conclusion is based on the statements of the Court in *Memphis* regarding the adequacy of notice for due process purposes:

> In essence, recipients of a cutoff notice should be told where, during which hours of the day, and before whom disputed bills appropriately may be considered.

436 U.S. at 14–15, n. 15, 98 S.Ct. at 1562–63, n. 15.

The purpose of such detailed notice being, of course, "to apprise the affected individual of, and permit adequate preparation for, an impending 'hearing' ". 436 U.S. at 14, 98 S.Ct. at 1562. Although the notice, at issue here, directed the affected individual to contact the office of the utility, it failed to contain the specific information, which this court finds, is mandated by the *Memphis* decision.

### b. OPPORTUNITY TO BE HEARD

"Some kind of hearing is required at some time before a person is finally deprived of his property interests." *Wolff v. McDonnell,* 418 U.S. 539, 557–558, 94 S.Ct. 2963, 2975–76, 41 L.Ed.2d 935 (1974). As noted by the Court in *Memphis,* due process requires the provision, by a public utility, of an opportunity for the presentation to a designated employee, empowered to resolve disputes, of a customer's complaint that he is being overcharged or charged for services not rendered. 436 U.S. at 16–18, 98 S.Ct. at 1564–65.

■ It is unclear, on the basis of the record before the court, whether the proce-

dure normally afforded customers of the City of Great Falls, prior to termination of water service, comports with the due process requirements enunciated in *Memphis.* What is clear on the basis of the facts admitted by the plaintiff in the present case, however, is the fact that the plaintiff was afforded a "hearing", prior to the termination of his water service, sufficient to pass constitutional muster. The hearing procedure afforded the plaintiff clearly allowed a presentation, to a designated employee empowered to resolve billing disputes, of the plaintiff's complaint that he was being overcharged or charged for services not rendered.

On two separate occasions, the plaintiff contacted the Utility Supervisor and was thereafter able to meet with the Utility Supervisor to discuss the accuracy of the disputed bill. The Utility Supervisor was empowered to settle billing disputes; the plaintiff does not contend otherwise. As a result of those meetings, the Utility Supervisor prepared a "cycle journal", reflecting the history of the disputed account and establishing the accuracy of that account. Although informal in nature, the pretermination meeting with the Utility Supervisor satisfied, in the opinion of this court, the dictates of the Due Process Clause as elucidated by the Court in *Memphis.* It is important to note that the dispute at issue dates back to February 1, 1979. Notice of termination was first communicated to the plaintiff on May 28, 1980 and again on March 8, 1981. Between May 28, 1980 and the date when service was first terminated, *i.e.,* June 25, 1981, the plaintiff had free access to a "responsible employee empowered to resolve the dispute." *Memphis Light, Gas and Water Div. v. Craft,* 436 U.S. at 18, 98 S.Ct. at 1564. Moreover, the plaintiff actually utilized the procedure available for resolving the dispute.

### IV. WAS THE PLAINTIFF AFFORDED DUE PROCESS OF LAW?

Application of the principles enunciated in the *Memphis* case to the facts presented in the instant case, leads this court to con-

clude that the plaintiff was not denied his right to due process of law by the actions of the defendants in terminating his water service.

This court has concluded that the notification procedure utilized by the City of Great Falls in terminating water service does not satisfy the requirements of the Due Process Clause of the Fourteenth Amendment. That conclusion, however, does not terminate the court's inquiry with respect to the question of whether this particular plaintiff received notice adequate to satisfy the prescriptions of the Due Process Clause. Review of the facts admitted by the plaintiff establishes that the plaintiff received "notice in fact" of the procedure to be utilized in challenging the charges due.

The controversy between the plaintiff and the defendants, regarding the termination of plaintiff's water service, transpired over a period in excess of one year. The plaintiff was well aware of the availability of a procedure to challenge and resolve the service charges at issue. The plaintiff knew when, where, how and before whom the procedure could be instituted and, in fact, utilized the procedure to present his objections to the charges. The facts presented establish that the deficiencies of the notice contained in the final notice of termination were cured, in effect, by the subsequent interactions between the plaintiff and the defendants. No termination of services occurred prior to the plaintiff having been apprised of the procedure available for resolution of his complaint. Moreover, no termination of services occurred prior to the plaintiff's utilization of that procedure.

As to the constitutional propriety of the procedure available to, and utilized by, the plaintiff to present his objections, the court's previous discussion suffices to establish that the procedure satisfied the require-. ments of the Due Process Clause as elucidated by the Supreme Court in the *Memphis* case.

## V. FIRST AMENDMENT CLAIM

Finally, the plaintiff claims that the defendant's termination of his water service was in retaliation for the plaintiff's assertion of his First Amendment right to petition his government for redress of his grievances. It is unclear from the complaint what act of petitioning his government is being referred to by the plaintiff. Two possible acts of petitioning exist. First, the plaintiff's act of seeking redress from the City itself. Second, the plaintiff's act of seeking redress, by way of intervention, from the Montana Public Service Commission. Whichever of these acts the plaintiff's pleading was intended to refer, the court finds it appropriate, on the basis of the record before it, to grant judgment on that claim in favor of the defendants.

On the basis of the facts admitted by the plaintiff, it is evident that the defendant's act of terminating the plaintiff's water service was set in motion long before the plaintiff petitioned any level of his government for redress. The act of termination was set in motion by the failure of the plaintiff to pay the charges due on his account. The defendants obviously postponed terminating service to the plaintiff, in the first instance, while the latter pursued redress via the procedure provided by the City, *i.e.* "hearing" with the Utility Supervisor. Termination was again postponed upon the City's acquiescence in the Montana Public Service Commission's request for postponement.

The termination of plaintiff's water service for nonpayment of service had its genesis at a point in time well in advance of the plaintiff's efforts to seek redress through the administrative channels available. The mere conclusory allegation that the defendants acted in retaliation for the plaintiff's exercise of his First Amendment rights must be rejected in light of the facts admitted by the plaintiff.

## VI. ATTORNEY'S FEES

Plaintiff's complaint seeks recovery of attorney's fees pursuant to 42 U.S.C. § 1988. The awarding of attorney's fees to the "prevailing party" in a civil rights action under 42 U.S.C. § 1983 is a

matter vested in the discretion of the trial court. Only prevailing parties may recover attorney's fees, but a party may prevail without obtaining formal relief. *Maher v. Gagne,* 448 U.S. 122, 129, 100 S.Ct. 2570, 2574, 65 L.Ed.2d 653 (1980). The plaintiff in the instant case has been unsuccessful in obtaining relief with respect to his claims against the defendants. It may be said, however, that the plaintiff has been successful to the extent that this court has recognized the constitutional impropriety of the general notice procedure utilized by the City in terminating water service to its customers. In that regard, it is fair to say that the plaintiff's actions may well serve as a catalyst in generating legislation designed to remedy an unconstitutional termination procedure, to the benefit of the general public. *See, e.g., Bartholomew v. Watson,* 665 F.2d 910, 914 (9th Cir.1982); *Robinson v. Kimbrough,* 652 F.2d 458, 466 (5th Cir.1981). Because of the catalytic effect which the plaintiff's persistence will surely yield, the court finds an award of reasonable attorney's fees to the plaintiff to be appropriate.

Considering the factors pertinent to an award of attorney's fees in a civil rights action, *see, Rivera v. City of Riverside,* 679 F.2d 795, 796 (9th Cir.1982) (citing *Kerr v. Screen Extras Guild, Inc.,* 526 F.2d 67, 69 (9th Cir.1975)), this court finds it appropriate to award the plaintiff attorney's fees in the sum of $500.00.

The due process question presented, although one of first impression in the State of Montana, is by. no means novel. The *Memphis* case attests to the fact that the precise question raised has been thoroughly litigated throughout this country. The availability of substantial precedent in the area of due process and its relationship to the termination of utility services eased the plaintiff's burden in presenting the issue. Nonetheless, the plaintiff has spent considerable time and effort in bringing the impropriety of the notice procedure, at issue here, to light.

An assessment of the time expended in briefing and arguing the due process issue presented, in light of the customary attorney's fees for this jurisdiction, leads the court to conclude that the sum awarded is reasonable.

An appropriate order shall issue.